**EXHIBIT A**

<u>Amended New Jersey Complaint</u>

(attached)

ANGELO A. STIO III (#014791997)
STEPHANIE L. JONAITIS (#015142002)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08543-5276
(609) 452-0808
*Attorneys for MicroBilt Corporation*

BRUCE S. LUCKMAN, ESQUIRE
**SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**
308 Harper Dr, #200
Moorestown, New Jersey 08057
(856) 663-1503
*Attorneys for Princeton Alternative Funding, LLC f/k/a MicroBilt Capital*
*Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC*

GERALD KROVATIN, ESQUIRE
**KROVATIN NAU, LLC**
60 Park Place, Suite 1100
Newark, NJ 07102
*Attorneys for MicroBilt Corporation And Princeton Alternative Funding, LLC*
*f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC*

GERARD M. MCCABE (to be admitted *Pro Hac Vice*)
**McCABE LAW GROUP, LLC**
6172 Argos Drive
Blue Bell, PA 19422
(215) 965-0003 (Main)
*Attorneys for MicroBilt Corporation And Princeton Alternative Funding, LLC*
*f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC*

| | |
|---|---|
| ROBERT FARRELL and ROBERT SZOSTAK, individually, and derivatively on behalf of PRINCETON ALTERNATIVE FUNDING, LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICROBILT FINANCIAL SERVICES CORP., MICROBILT CORPORATION, PHILIP N. BURGESS, Jr., WALTER WOJCIECHOWSKI, ALONZO J. PRIMUS, PRINCETON ALTERNATIVE FUNDING, LLC, PRINCETON ALTERNATIVE FUNDING, LLC F/K/A MICROBILT CAPITAL FUNDING, LLC, and JOHN DOES 1, 2 and 3,<br><br>    Defendants, and,<br><br>PRINCETON ALTERNATIVE FUNDING, LLC, a Delaware limited liability company,<br><br>                Nominal Defendant,<br><br>    v.<br><br>LAWRENCE WEST, ESQUIRE, SEC WHISTLEBLOWER CONSULTANTS, LLC, EDWARD M. BERNSTEIN, ESQUIRE, BERNSTEIN & MANAHAN, LLC, DARREN M. BALDO, ESQUIRE, JOHN BARRILE, PATANJALI NANDA, CREATIVE BUSINESS DECISIONS, INC., DYNAMIC VERTICAL SOLUTIONS, INC., JOHN AND JANE DOES 1 THROUGH 10, and JOHN DOE ENTITIES 1 THROUGH 10, all whose true names are unknown,<br><br>And<br><br>COPLEY SZOSTAK<br>290 N Olive Avenue, Apt. 816<br>West Palm Beach, FL 33401-5581<br><br>and<br><br>SARAH COPLEY SZOSTAK<br>3858 Crosshill Street<br>Kannapolis, NC 28081,<br><br>    Third Party Counterclaim-Defendants. | **SUPERIOR COURT OF NEW JERSEY**<br>**CHANCERY DIV. – MERCER COUNTY**<br><br>**DOCKET NO. MER-C-6-16**<br><br>*Civil Action*<br><br>**CONSOLIDATED WITH**<br><br>**SUPERIOR COURT OF NEW JERSEY**<br>**LAW DIVISION, MERCER COUNTY**<br><br>**DOCKET NO. MER-L-0675-20**<br><br>**FOURTH AMENDED COUNTERCLAIM**<br><br>**JURY DEMAND** |

**DEFENDANTS'/COUNTERCLAIMANTS'**
**FOURTH AMENDED COUNTERCLAIMS AGAINST**
**PLAINTIFFS AND THIRD PARTY COUNTERCLAIM-DEFENDANTS**

Defendants/Counterclaimants Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, and MicroBilt Corporation, by way of this **FOURTH AMENDED COUNTERCLAIMS** against (i) Plaintiffs/Counterclaim-Defendants Robert Farrell and Robert Szostak, and now also (ii) the Third Party Counterclaim-Defendants Lawrence West, SEC Whistleblower Consultants, LLC, Edward M. Bernstein, Bernstein & Manahan, LLC, Darren M. Baldo, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., Dynamic Vertical Solutions, Inc., Copley Szostak, Sarah Copley Szostak, John and Jane Does 1 through 10, and John Doe Entities 1 through 10 (collectively, the "Third Party Counterclaim-Defendants"), state as follows:[1]

## The Parties

### Defendants/Counterclaim Plaintiffs

1.      Defendant/Counterclaim Plaintiff Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC ("Successor PAF"), is a Delaware limited liability company, and successor-in-interest to Princeton Alternative Funding, LLC ("PAF"), a Delaware limited liability company formed on August 29, 2014, with a principal place of business located at 100 Canal Point Boulevard, Princeton, NJ 08540. All rights, title and interest, once held by PAF, are now held by Successor PAF, and thus any reference to an injury to PAF is a reference to an injury to Successor PAF. PAF was the General Partner of Princeton Alternative Income Fund, L.P. ("PAIF"), an investment fund that provided lines of credit to loan originators who, in turn, used those funds to finance subprime consumer loans.

---

[1] Plaintiffs/Counterclaim-Defendants Farrell and Szostak, and Third Party Counterclaim-Defendants are referenced herein, collectively, as "All Defendants."

2.      Defendant/Counterclaim Plaintiff MicroBilt Corporation ("MicroBilt") is a Delaware corporation with a principal place of business located at 100 Canal Point Boulevard, Princeton, NJ 08540. MicroBilt was the majority owner of PAF through its wholly owned subsidiary, MicroBilt Financial Services Corp.

3.      Defendants/Counterclaim Plaintiffs MicroBilt and Successor PAF are also referenced herein, together, where appropriate, as either "Counterclaim Plaintiffs."

**Plaintiffs/Counterclaim-Defendants
And Third Party Counterclaim-Defendants**

**Plaintiff/Counterclaim-Defendant Robert Farrell**

4.      Plaintiff/Counterclaim-Defendant **Robert Farrell** ("Farrell") is an individual residing at 10 Darvel Drive, West Windsor, NJ, and a former Managing Member of PAF. Immediately prior to joining PAF, Farrell owned and operated cash for gold stores that operated out of strip malls.

5.      Farrell's employment history also reveals that he once was a partner for an entity known as Cornell Capital Partners. Farrell left Cornell Capital Partners to form Sagamore Holdings, Inc., and then utilized Sagamore Holdings to acquire another entity, Nexus Custom Electronics, Inc., with money that was borrowed from Cornell Capital Partners.

6.      Sagamore Holdings, under Farrell's leadership, was a failure. It defaulted on its repayment obligations to Cornell Capital, which resulted in Cornell Capital seizing all of Nexus's assets.

7.      Cornell Capital, which Farrell helped run, changed its name to Yorkville Advisors, and following Farrell's departure was subject to a $1 billion claim by the Securities and Exchange Commission (the "SEC") for fraud for overvaluing assets and $99 million tax bill for failing to pay taxes on its U.S. based income.

3

8.     While Farrell's Complaint tries to portray him as an experienced financial service industry professional, Farrell's employment history reveals a pattern of leaving entities he managed in ruins.

### Plaintiff/Counterclaim-Defendant Robert Szostak

9.     Plaintiff/Counterclaim-Defendant **Robert Szostak** ("Szostak") is an individual currently residing at 290 N Olive Avenue, Apt. 816, West Palm Beach, FL 33401-5581, and formerly residing at both 3191 South Dixie Highway, Apartment #515, West Palm Beach, FL 33405, and, before then, at 31330 Palm Court, Lawrenceville, NJ.

10.     Szostak is a former Managing Member of PAF.

11.     In the ten years before he joined PAF, Szostak held eight different jobs with different employers. In addition, Szostak's employment history reveals that he was terminated from his position at Dean Witter Reynolds, Inc., for "compliance violations."

12.     While the Complaint tries to portray Szostak as an experienced financial service industry professional who identified and developed investors, his employment history reveals an individual that had trouble holding a job and had little regard for compliance.

13.     Had Farrell or Szostak truthfully disclosed their backgrounds to the other members and equity holders, they would have never been asked to be a part of PAF.

### Third Party Counterclaim-Defendants

14.     Third Party Counterclaim-Defendant **Lawrence West, Esquire** ("West"), is an individual residing at 7721 Tomlinson Avenue, Cabin John, MD 20818. West is both (i) a whistleblower consultant who has consulted Farrell and Szostak in the efforts to encourage an SEC investigation into Counterclaim Plaintiffs and (ii) a sometime attorney who falsely claimed to legally represent Farrell and Szostak in order to attempt to abuse the attorney-client privilege shield years after the fact. West assumed a lead role in the misconduct of All Defendants by disseminating

4

and publishing repeated and numerous false and misleading statements to third parties, including without limitation, the SEC in furtherance of the False Scheme (as defined herein), thereby violating both New Jersey statutory and common law.

15. Third Party Counterclaim-Defendant **SEC Whistleblower Consultants LLC** ("SEC Consultants") is a single member limited liability company which has offices located at 1815 19th Street, NW, Washington, DC 20009. SEC Consultants is not organized as and does not market itself as a law firm. SEC Consultants, at all times relevant hereto, operated through West who, upon information and belief, was its sole and managing member. West's violations of both New Jersey statutory and common law are similarly violations by, and otherwise imputed to, SEC Consultants. All references herein to West shall also include, be understood as and incorporate a reference to SEC Consultants.

16. Third Party Counterclaim-Defendant **Edward M. Bernstein** ("Bernstein") is an individual residing at 4 Bennington Drive, Lawrence Township, NJ 08648. Bernstein is an attorney (a partner with Bernstein & Manahan, LLC) who has represented the legal interests of Farrell and Szostak and who, in close coordination with Baldo and others, ghost wrote many emails and factual arguments that were false and perpetuated the lies being peddled by Farrell and Szostak. Bernstein has participated in the misconduct of All Defendants by disseminating and publishing repeated and numerous false and misleading statements to third parties, including the SEC and Virginia Counsel (as defined below) in furtherance of the False Scheme, thereby violating both New Jersey statutory and common law.

17. Third Party Counterclaim-Defendant **Bernstein & Manahan, LLC** ("BMLLC"), is a limited liability company law firm based in New Jersey which has offices located at Lawrence Executive Center, 3120 Princeton Pike, Suite 302, Lawrenceville, NJ 08648. BMLLC, at all times relevant hereto, operated through Bernstein. Bernstein's violations of both New Jersey statutory

and common law are similarly violations by, and otherwise imputed to, BMLLC. All references herein to Bernstein shall also include, be understood as and incorporate a reference to BMLLC.

18.     Third Party Counterclaim-Defendant **Darren M. Baldo** ("Baldo") is an individual residing at and/or having an office located at 4093 Quakerbridge Road, Princeton Junction, NJ 08550. Baldo is an attorney who has represented the legal interests of Farrell and Szostak, and who, in close coordination with Bernstein and others, ghost wrote many emails and factual arguments that were false and perpetuated the lies being peddled by Farrell and Szostak. Baldo is also part owner of, and Counsel and CFO of Keycap Business Funding LLC ("Keycap Funding"), a business also owned and managed by Farrell and Szostak, that was competitive with MicroBilt and PAF. Baldo has participated in the misconduct of All Defendants (i) by conspiring to use Confidential Information (as defined herein) to promote Keycap Funding's wrongful competition with MicroBilt and PAF and (ii) by disseminating and publishing repeated and numerous false and misleading statements to third parties in furtherance of the False Scheme, thereby violating both New Jersey statutory and common law.

19.     Third Party Counterclaim-Defendant **John Barrile** ("Barrile") is an individual residing at 1504 Bay Road, Apartment 3201, Miami Beach, FL 33139-3281. Barrile was a former insider who worked at MicroBilt and PAF and had access to and disclosed MicroBilt's and PAF's Confidential Information to Farrell and Szostak and others, and also disseminated False Information in order to improperly buttress the SEC Investigation and SEC Complaint and complaint against MicroBilt, PAF, Philip N. Burgess, Jr., Walter Wojciechowski and others. Barrile has participated in the misconduct of All Defendants by not only violating his duties of non-disclosure of MicroBilt's and PAF's Confidential Information, but also by disseminating and publishing repeated and numerous false and misleading statements to third parties in furtherance of the False Scheme, thereby violating both New Jersey statutory and common law.

20.     Third Party Counterclaim-Defendant **Patanjali Nanda** ("Nanda") is an individual residing at 1816 Aspen Drive, Plainsboro, NJ 08536. Nanda is a prior consultant for MicroBilt and PAF who had access to and disclosed Confidential Information to Farrell and Szostak and others, and, as well participated in the delivery of False Information in order to improperly buttress the SEC Investigation and SEC Complaint. Nanda and his businesses, CBD and DVS (as each defined below), entered into the following agreements with MicroBilt (collectively, the "Nanda Agreements") (attached hereto as **Exhibit C**): (i) Non-Disclosure, Non-Solicitation, Non-Competition and Work Product Agreement (the "Non-Disclosure Agreement"), dated January 1, 2016, by and between Nanda and MicroBilt; (ii) Independent Contractor Agreement, by, between and among MicroBilt, Nanda and CBD, dated January 1, 2016, and terminated effective September 13, 2022 (the "Nanda 1099 Agreement"); (iii) MicroBilt Integration Sales Agent Agreement, dated July 29, 2009, by and between MicroBilt and CBD (the "Nanda Integration Agreement"); (iv) MicroBilt Revenue Sharing Agreement, dated September 6, 2016, by and between MicroBilt and DVS d/b/a CBD Credit (the "Nanda Revenue Share Agreement"). Each of the Nanda Agreements included broad confidentiality provisions whereby Nanda and his respective business entity agreed to maintain and protect the confidentiality of MicroBilt's and its affiliates, including PAF, confidential business information. Nanda has participated in the misconduct of All Defendants by not only violating his duties of non-disclosure of MicroBilt's and PAF's Confidential Information, but also by disseminating and publishing repeated and numerous false and misleading statements to third parties in furtherance of the False Scheme, thereby violating both New Jersey statutory and common law.

21.     Third Party Counterclaim-Defendant **Creative Business Decisions, Inc.** ("CBD"), is a New Jersey corporation which has offices located at 12 Roszel Road, Suite B200, Princeton, NJ 08540. CBD, at all times relevant hereto, operated through Nanda. Nanda's violations of both

New Jersey statutory and common law are similarly violations by, and otherwise imputed to, CBD. All references herein to Nanda shall also include, be understood as and incorporate a reference to CBD.

22. Third Party Counterclaim-Defendant **Dynamic Vertical Solutions, Inc.** ("DVS"), is a New Jersey corporation which has offices located at 12 Roszel Road, Suite B200, Princeton, NJ 08540. DVS, at all times relevant hereto, operated through Nanda. Nanda's violations of both New Jersey statutory and common law are similarly violations by, and otherwise imputed to, DVS. All references herein to Nanda shall also include, be understood as and incorporate a reference to DVS.

23. Third Party Counterclaim-Defendant **Copley Szostak** ("Copley") is an individual residing at 290 N. Olive Avenue, Apt. 816, West Palm Beach, FL 33401-5581. Copley is the spouse of Szostak and, at all relevant times, operated a promotional-products business conducted under the names "Present Company" and "Promotions by Copley." Copley has participated in the actionable misconduct of All Defendants by disseminating and publishing the False Information and Confidential Information, including litigation materials subject to a pending confidentiality application, to members of the financial press in furtherance of the False Scheme, thereby violating New Jersey common law. All references herein to the conduct of Copley are made in her individual capacity.

24. Third Party Counterclaim-Defendant **Sarah Copley Szostak** ("Sarah") is an individual residing at 3858 Crosshill Street, Kannapolis, NC 28081. Sarah is the daughter of Szostak and Copley whose married last name is now "Marcucci." At all relevant times, Sarah maintained and controlled the email account sarahcopley17@gmail.com, managed certain of PAF's public-facing social-media accounts, and disseminated and published the False Information and Confidential Information, including a pleading the confidential character of which was then

the subject of a pending court application, to members of the financial press in furtherance of the False Scheme, thereby violating New Jersey common law. All references herein to the conduct of Sarah are made in her individual capacity.

25.    Upon information and belief, Third Party Counterclaim-Defendants **JOHN AND JANE DOES 1 THROUGH 10** (the "Third Party Individual Defendants") are individuals whose names and addresses of residences are unknown.

26.    Upon information and belief, Third Party Counterclaim-Defendants **JOHN DOE ENTITIES 1 THROUGH 10** (the "Third Party Corporate Defendants") are business entities, the names and addresses of offices of which are unknown. (Third Party Individual Defendants and Third Party Corporate Defendants, together, "JOHN DOE"). **JOHN DOE** participated in the misconduct of All Defendants by not only violating their duties of non-disclosure of MicroBilt's and PAF's Confidential Information, but also by disseminating and publishing repeated and numerous false and misleading statements to third parties in furtherance of the False Scheme, thereby violating both New Jersey statutory and common law as violated by the Third Party Counterclaim-Defendants.

**Background Facts**

A.    **Farrell And Szostak Are Misusing Trade Secrets And Breaching Confidentiality Obligations Under Non-Disclosure Agreements.**

27.    On January 25, 2016, Farrell and Szostak instituted this action (as amended, the "Complaint") against PAF and the other Defendants in both their individual capacity and derivatively on behalf of PAF.

28.    The Complaint and its attachments improperly identified PAF's investors and the amount of their investments, PAF's customers and the amounts of their loans, and the terms of PAF's confidential agreement with MicroBilt.

9

29.     During their tenures, Farrell and Szostak each executed a Non-Disclosure Agreement with MicroBilt. True and accurate copies of the Non-Disclosure Agreements signed by Farrell and Szostak are attached as **Exhibit A** and **Exhibit B**.

30.     Farrell and Szostak were Managing Members of PAF.

31.     The Non-Disclosure Agreements stated, in relevant part, that PAF and PAF's representatives, which are defined to include all of PAF's directors, officers, employees, agents, advisors and representatives (collectively, the "PAF Representatives"), would hold "in confidence and will not, without written consent of [MicroBilt and its affiliates], be disclosed, in whole or part by [PAF], or any of [the PAF Representatives], and no Confidential Information shall be used by [PAF], or any of [the PAF Representatives], for any purpose whatsoever, except in connection with the Transaction."

32.     The Non-Disclosure Agreements define the confidential information of MicroBilt and its affiliates ("Confidential Information") to include "all business, financial, sales, officer, director, employee, consultant, vendor, customer, consumer and payment information belonging to [MicroBilt and its affiliates]." (The term "Confidential Information" used herein shall further be defined as that definition of business trade secret and proprietary information as defined by applicable New Jersey Trade Secret Act (N.J.S.A. 56:15-1 *et. seq.*) and common law).

33.     Further, the Non-Disclosure Agreements recognize that PAF could not disclose Confidential Information to any of the PAF Representatives "unless such Representatives agree to be bound by the terms of the Non-Disclosure Agreement."

34.     Farrell and Szostak as "Managing Director[s]" of PAF each agreed to be bound to the Non-Disclosure Agreements by executing their versions on September 1, 2014.

10

35. The Non-Disclosure Agreements prohibit Farrell and Szostak from, among other requirements, disclosing to unauthorized third parties the Confidential Information of MicroBilt and its affiliated entities, including PAF.

36. On February 17, 2016, Defendants filed a Limited Motion to Seal Confidential Commercial and Financial Information by Redacting Initial Filings ("Motion to Seal") in order to seal the Confidential Information disclosed by Farrell and Szostak in the Complaint and to prevent Farrell and Szostak from making further disclosures of the Confidential Information to third parties.

37. Defendants filed the Motion to Seal to, among other things, maintain the confidentiality of the identity of PAF's investors and PAF's customers to prevent competitors from soliciting these entities.

38. After conducting oral argument on March 18, 2016, the Court entered an Order on April 15, 2016 granting Defendants' motion for confidentiality and requiring the following information to be redacted from all filings: (i) information about PAF's investors and the amounts of their investments, (ii) information about PAF's agreement with MicroBilt, including pricing, and (iii) information about the identity of PAF's customers and their loan amounts.

39. Shortly after PAF terminated Farrell's and Szostak's employment, Farrell and Szostak started and joined as owners and executives Keycap Funding.

40. At this same time, Farrell and Szostak also started Princeton Lenders LLC ("Princeton Lenders"), and Crossbow Capital LLC ("Crossbow Capital"), which purport to arrange for alternative financing for businesses and consumers.

41. Farrell and Szostak each joined Keycap Funding in the capacity of Managing Partner, and participated in the ownership of Keycap Funding along with Baldo who joined Keycap Funding as a senior executive role and part-owner.

42.     According to Keycap Funding's website, Keycap Funding, consistent with alternative financing businesses, connects "businesses that seek capital with traditional and alternative lenders."

43.     Keycap Funding's provision of services to businesses seeking alternative lenders competes with both Survivor PAF, which also serves businesses in the alternative lending market, and MicroBilt as PAF's affiliate.

44.     In or around December 2016, counsel for PAF learned that Farrell and Szostak had been in direct contact with at least three of PAF's customers.

45.     PAF also learned that Szostak would go on PAF's Constant Contact lead provider database (a subscription service) and download contacts that he would then transfer to his own personal computer.

46.     By way of example, in October 2015, when Farrell and Szostak were conspiring to start a new fund, Szostak downloaded and stole numerous customer leads, customers and prospects of both MicroBilt and PAF. Below is a spreadsheet from Constant Contact showing the exporting of information by Szostak.

| Recent Imports, Exports, and Other Actions | | |
| --- | --- | --- |
| Date | Activity Type | Details |
| Completed | | |
| Oct 25, 2015 4:02pm EDT | Export Opens Report | Download CSV \| Download Excel 840 Contacts |
| Oct 25, 2015 3:59pm EDT | Export Clicks Report | Download CSV \| Download Excel 83 Contacts |
| Oct 25, 2015 3:56pm EDT | Export Opens Report | Download CSV \| Download Excel 394 Contacts |
| Oct 25, 2015 3:52pm EDT | Export Opens Report | Download CSV \| Download Excel 1322 Contacts |
| Oct 25, 2015 3:45pm EDT | Export Opens Report | Download CSV \| Download Excel 2199 Contacts |
| Oct 22, 2015 10:34pm EDT | Export Clicks Report | Download CSV \| Download Excel 76 Contacts |

47.     Upon information and belief, Farrell and Szostak contacted MicroBilt's and PAF's customers, prospects and leads in order to solicit business away from MicroBilt and PAF.

48.     Farrell and Szostak also contacted these customers and disclosed confidential information for the sole purpose of damaging the reputation of MicroBilt and Successor PAF and their good will in the marketplace.

49.     PAF further discovered that Szostak had been in repeated contact with James Prado Roberts, a hedge fund reporter ("Hedge Fund Reporter") for Hedge Fund Alert, a national newsletter for hedge funds.

50.     Szostak approached the Hedge Fund Reporter in order to solicit him to write false stories about PAF, including negative articles about Szostak's and Farrell's terminations and the lawsuit that they filed.

51.     The April 15, 2016 Order prevented the solicitation of PAF's customers by third parties by requiring Farrell and Szostak keep certain PAF customer identities confidential.

52.     The Non-Disclosure Agreements prevented Farrell and Szostak from using any Confidential Information that was provided by MicroBilt or its affiliates and subsidiaries.

53.     The Non-Disclosure Agreements further required Farrell and Szostak to return or destroy within 10 days the Confidential Information upon request by MicroBilt, which occurred on January 4, 2016.

54.     Despite their confidentiality and non-disclosure obligations, Farrell and Szostak have abused the discovery process and breached their fiduciary duties by stealing Confidential Information from MicroBilt and PAF and using that information to damage Successor PAF and MicroBilt.

55.     Over the last few months, following years of efforts to compel their full and complete discovery production, Farrell and Szostak have finally produced their electronic devices

for forensic examination which has produced a significant amount of new information, documents and communications (the "New Discovery") that was unknown to and could not have been discovered by MicroBilt and PAF, and that neither MicroBilt nor PAF has ever had access to before.

56.    This New Discovery has revealed an intricate web of impermissible disclosures of MicroBilt's and PAF's Confidential Information as well as a concerted, repeated, long-standing (since as early as 2016) and detailed efforts by Farrell, Szostak and the Third Party Counterclaim Defendants to disseminate False Information in a joint effort to cause financial harm to MicroBilt and PAF.

57.    Specifically, the New Discovery has revealed that Nanda, similarly obligated pursuant to the Nanda Agreements to protect the Confidential Information of MicroBilt and PAF, has wrongfully disclosed such Confidential Information to unauthorized third parties, all in an effort to cause financial harm to MicroBilt and PAF.

58.    Similarly, the New Discovery has revealed that Barrile, who gained access to the Confidential Information of MicroBilt and PAF in violation of his common law duties has used such Confidential Information, as well as disseminated False Information, in an unlawful manner to enrich himself and cause financial harm to MicroBilt and PAF by disclosing the Confidential Information to unauthorized third parties and otherwise publishing the False Information to other recipients.

59.    Likewise, due to the New Discovery, MicroBilt and PAF have further learned that Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein and West also participated in, conspired with and otherwise aided and abetted Farrell, Szostak, Nanda and Barrile with their breaching of their contractual and common law duties with the unauthorized publication of the Confidential Information to third parties.

60. Farrell, Szostak, Nanda and Barrile have breached the confidentiality obligations in the Non-Disclosure Agreements, Nanda Agreements and New Jersey statutory law, by misusing Confidential Information in their new endeavors and failing to return or destroy Confidential Information, and by otherwise publicizing such Confidential Information to unauthorized third parties in an effort to enrich themselves and cause financial harm to MicroBilt and PAF.

61. MicroBilt and Successor PAF now files these counterclaims to seek compensation for damages caused by the unlawful disclosure, and the aiding and abetting of the unlawful disclosure, of the Confidential Information by Farrell, Szostak and the other Third Party Counterclaim-Defendants and otherwise prevent (and recover damages for): (i) Farrell's and Szostak's further direct solicitation of PAF's customers through the use of misappropriated Confidential Information; (ii) Farrell, Szostak, Nanda and Barrile from further violating their duties of non-disclosure of the Confidential Information; (iii) Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein and West from further damaging MicroBilt and Successor PAF in the marketplace by their conspiring, malicious, intentional and deliberate disclosure of Confidential Information to unauthorized third parties and, as set forth below, the disclosure of the False Information (as defined *infra*), all in an effort to cause MicroBilt and PAF financial harm and enrich themselves.

62. MicroBilt now files these counterclaims to enforce the terms of the Non-Disclosure Agreements and Nanda Agreements as to Farrell, Szostak and Nanda and prevent the further and future misuse of Confidential Information by each of the Third Party Counterclaim-Defendants.

63. MicroBilt and PAF further files their New Jersey common law conspiracy claim, as set forth hereafter in detail, against All Defendants because such All Defendants have colluded together as an association of fact (the "Conspiracy") to commit a pattern of interrelated predicate acts (the "Predicate Incidents") against Counterclaim Plaintiffs based upon a common scheme of

working with Farrell and Szostak to cause financial harm to Counterclaim Plaintiffs, Philip N. Burgess, Jr., Walter Wojciechowski and others, through the dissemination of the False Information on a variety of topics to various third parties and governmental agencies in order to enrich themselves.

**B.      Farrell's And Szostak's Breach Of Duties Of Care And Loyalty**

64.     Farrell was a co-founder, Managing Member and President of PAF from August 29, 2014, through January 4, 2016, when PAF terminated him.

65.     Farrell was supposed to be responsible for PAF's day-to-day operations, participation in due diligence (initial approval and ongoing credit line advances), credit line and document compliance responsibilities for PAF's loan origination customers and was responsible for obtaining and reviewing loan origination customers' financial information and statements each month.

66.     Farrell was also supposed to be responsible to ensure that PAF was advancing funds to loan originators that were being used to fund consumer loans and further responsible for ensuring that PAF obtained valid collateral for all funds advanced.

67.     The original agreement was that neither Farrell nor any of the equity holders in the company would receive a salary or profit distributions until PAF became profitable. Farrell was provided with equity that he knew would increase in value through his hard work and, it was understood that, once PAF was profitable and remained profitable, Farrell would receive a $5,000 per month salary that would increase by $1,000 up to a maximum of $10,000 per month.

68.     Szostak had the same arrangement.

69.     Despite the agreement that none of the equity holders would receive a salary or profit distribution until PAF was profitable, in August 2015, Farrell and Szostak demanded that they begin receiving a monthly salary, even though PAF was not profitable.

70. PAF ultimately agreed to Farrell's and Szostak's demands and paid them $5,000 each in August 2015.

71. This amount increased by $1,000 for each month through November 2015. Szostak received the same amounts.

72. In spite of PAF agreeing to Farrell's and Szostak's demands, in September 2015, Farrell began to threaten to leave PAF, take customers, vendors and employees with them and start a competing fund.

73. In a meeting, occurring on or about January 4, 2016, Farrell threatened Walter Wojciechowski, MicroBilt's CEO ("Wojciechowski"), and Philip N. Burgess, Jr. ("Burgess"), with burning PAF to the ground.

74. During his tenure at PAF, Farrell's actions were consistent with his threats to burn PAF to the ground and start a new fund.

75. Unbeknownst to the other members and equity holders in PAF, Farrell engaged in serious misconduct and gross negligence that impacted the work of others that were providing marketing, compliance, treasury and legal services to PAF.

76. Farrell's actions were for the sole purpose of damaging PAF and exposing it to significant liability.

77. By way of example, during his tenure Farrell either intentionally or through gross negligence ignored marketing materials, compliance and record keeping.

78. Farrell also would not follow company procedures governing treasury and wiring of funds to PAF's customers.

79. Farrell who was responsible for wiring advances to borrowers, would routinely, either intentionally or as a result of gross negligence, wire the wrong amounts to borrowers.

80. Farrell would attempt to process wire transactions immediately without required approval, without regard to established procedure or appropriate documentation being in place and without verification that the amounts that were being wired were accurate. This resulted in duplicate transactions, missed transactions and incorrect amounts being wired to borrowers.

81. Other employees and consultants for PAF would direct Farrell to follow company procedures and the verification process that was in place, but Farrell failed and refused to do so in order to damage PAF.

82. The little documentation that Farrell did keep for the business he conducted also was inaccurate, or worse yet, missing information or simply unintelligible.

83. Farrell would often scribble information on the back of other documents as his memorialization of transactions he processed or approved. PAF's first-year audit was more difficult and time consuming and costly because Farrell's record keeping was poor or non-existent. It also made it stressful for members of the accounting department to work with Farrell.

84. PAF also discovered that Farrell would routinely ignore his responsibility to properly manage credit lines and document compliance for PAF loan originators and he altogether failed to obtain and review loan origination customers' financial information and statements on a monthly basis to ensure (a) advances that PAF made were to be used to fund consumer loans, (b) the consumer loans being made by loan originators complied with PAF's definition of eligible receivables and (c) the consumer loans would serve as valid collateral for the money PAF advanced.

85. Farrell's mismanagement was not limited to document management and compliance. Farrell gave little concern for accounting records that were provided to him.

86. Farrell would ignore his responsibility to review month end accounting records and would approve interest schedules for borrowers that had the wrong information.

87.     In fact, when the fund administrator would send the monthly reporting over to Farrell for approval to be released to PAF's investors, Farrell would rubber stamp the documents without any review and then joke about how he had no idea what they even said.

88.     Farrell's grossly negligent and intentional acts of refusing to fulfill compliance, accounting, treasury and documentation responsibilities, created a platform for unscrupulous borrowers to commit theft and fraud under his watch.

89.     As Managing Member of PAF and the senior individual responsible for ensuring that advances that PAF made were used for consumer loans and these loans complied with PAF's definition of eligible receivables, Farrell was able to hide his egregious acts from PAF's other managing members and equity holders.

90.     As Managing Member of PAF and the senior individual responsible for oversight, analysis and review of the financial information provided from loan originators, Farrell was able to hide his egregious acts from PAF's other managing members and equity holders.

91.     While Farrell and Szostak attempt to excuse their poor performance by raising allegations in their Complaint that MicroBilt never provided them with a functioning dashboard, the fact of the matter is that Farrell and Szostak had little understanding of what a dashboard was and how it was to be used.

92.     In fact, Farrell was provided with a working dashboard, which he described in an email as "really looking sharp."

93.     Farrell and Szostak were incapable of utilizing the dashboard because they were technologically illiterate and incapable of understanding the simplest of concepts.

94.     Indeed, Farrell and Szostak had a hard time logging into their computers, operating email and MicroSoft programs.

**C.     Farrell's And Szostak's Fraud On PAF**

19

95.     Farrell and Szostak also conspired with PAF's investors, Ranger, Alternative Management II, L.P., Ranger Specialty Income Fund, L.P., and Ranger Direct Lending Fund Trust and its sole beneficiary, Ranger Direct Lending Fund PLC, which is a public Trust listed on the London Stock Exchange (collectively, "Ranger"), to create spreadsheets that were knowingly false and represented to PAF members and officers, that PAF had not extended credit facilities to any single loan originator in excess of $4 million. (Ranger's prospectus had advised its investors that it would not lend in any single instance more than $4M, and so these spreadsheets were an effort by Farrell, Szostak and Ranger to cover up Ranger's failure to abide by its binding but violated investor representations).

96.     The spreadsheets that Farrell and Szostak created and circulated with Ranger's assistance, represented that all loans originated by Argon Credit were held in numerous individual subsidiaries (or single purpose entities) in various states throughout the United States.

97.      Argon Credit was a subprime lender that borrowed funds from PAIF in order to fund their short term consumer loans.

98.     Wojciechowski discovered in early 2017 that the information on the spreadsheets (that he had actually seen in 2016 after Farrell's departure) was false as the loans were all held by Argon X, LLC, and not the individual subsidiaries established by Argon Credit to originate the loans.

99.     Farrell and Szostak, with the assistance of Ranger, created the spreadsheets on a monthly basis showing that the loans were held by the Argon Credit subsidiaries and not Argon X.

100.    To make matters worse, Farrell and Szostak provided these spreadsheets to Ranger and to PAF and PAF's officers to demonstrate the entities that owned the loans and to show that

Ranger was compliant with its own fund documents (in other words, that no loans to a single borrower exceeded Ranger's limits).

101.    Farrell and Szostak also used the fraudulent spreadsheets to induce PAF to fund loans originated by the Argon Credit subsidiaries in amounts that were far in excess of the amounts Argon Credit should have reasonably been able to borrow.

102.    Farrell and Szostak never advised the other members of PAF or PAF's officers of their actions and the creation of knowingly false spreadsheets that were relied on to fund loans.

103.    Argon Credit ultimately filed for bankruptcy in December 2016.

104.    Upon information and belief, following the Argon Credit bankruptcy filing, Farrell and Szostak contacted the SEC and made knowingly false statements about PAF and PAF's operations which were designed to harm PAF, MicroBilt, Burgess, Wojciechowski, and their respective officers and its employees *and* to conceal Farrell's and Szostak's fraudulent and wrongful action in connection with the Argon Credit loans and oversight of such loans.

105.    Farrell's and Szostak's lies and false statements made to the SEC, in or about March to May 2017, and then repeatedly for years thereafter, either directly themselves or through West, as their whistleblower consultant, and thereafter as further described herein (the "False Information"), included, without limitation, the following falsities:

   a. Asserting that PAF did not have access to resources, such as loan and consumer loan performance and monitoring;
   b. Asserting that MicroBilt failed to and never identified preferred lenders to which PAF would lend money;
   c. Making false statements to PAF's investors regarding the foregoing resources;
   d. Asserting that Burgess's role was intentionally and wrongfully concealed from investors, when Farrell and Szostak each knew legal advice regarding whether and how to disclose Burgess's involvement and consultation services had been obtained;
   e. Willfully ignoring the necessity of structuring a side pocket to hold the Argon asset;
   f. Willfully ignoring basic accounting principles related to side pockets;
   g. Willfully ignoring PAF/Funder Recovery RS's compliance with GAAP accounting principals
   h. Disregarding the necessity of having to write-down the side pocket and then having to continuously monitor the side pocket as more information is learned;

i.    Asserting the distribution of performance fees which never occurred;

j.    Failing to acknowledge that PAF lost money;

k.    Misstating the amount of assets under management;

l.    Making false assertions of MicroBilt's and PAF's financial mismanagement;

m.    Misapplying the monthly gain to the side pocket;

n.    Failing to acknowledge the side pocket when calculating the performance fees;

o.    Asserting falsely that the PAIF had lent $77M;

p.    Asserting that the January 2017 testimony was false when it was not because the true losses were unknown at that time;

q.    Failing to attribute and account for the necessity of having to restate the side pocket as new information is learned; and, without limitation; and, without limitation,

r.    Asserting falsely fraud in PAF's earning and willfully ignoring earnings mentioned were net of the side pocket losses that Ranger and the PAF shared and were cited as such on the tear sheets which were ignored by Farrell and Szostak.

106.    The False Information that Farrell, Szostak and, as alleged *infra*, the other Third Party Counterclaim-Defendants disseminated and published to the SEC and other third parties included other knowingly inaccurate and recklessly misunderstood False Information about MicroBilt, PAF, Burgess and Wojciechowski (as described herein).

107.    Farrell, Szostak and the other Third Party Counterclaim-Defendants published, and aided and abetted the publication of such False Information to certain third parties which included, without limitation: (i) the SEC; (ii) Ranger (involved in an acrimonious arbitration with PAF and PAIF), including both Nimrod Hacker ("Hacker"), Ranger's General Counsel, and Timothy D. Katsiff, Esquire ("Katsiff"), Ranger's outside counsel; (iii) PAIF's Bankruptcy Trustee; (iv) Virginia consumer plaintiffs' counsel, Leonard Bennett and Kelly Guzzo ("Virginia Counsel") involved in rancorous litigation with MicroBilt, Burgess and others; (v) Bruce Goldstein, an industry professional; (vi) the Hedge Fund Alert (James Prado Roberts); (vii) the Argon Credit's Bankruptcy Trustee; and (viii) the financial-press reporters to whom the sealed litigation materials were transmitted, namely Jasmin Leitner of Pageant Media, Ryan Weeks, Editor of AltFi, Sean Murray of debanked.com, and Peter Rudegeair of The Wall Street Journal (collectively, the "False Information Recipients"), all of which such dissemination of the False Information served the

purpose of attempting to cause financial harm to MicroBilt, PAF, Burgess and Wojciechowski, while enriching Farrell, Szostak and each Third Party Counterclaim-Defendant.

108. The False Information was not only being published to these False Information Recipients, but was also being disseminated to anyone willing to listen in the country that was involved in a commercial dispute with MicroBilt, PAF, Burgess and Wojciechowski, and that these parties thought could cause financial harm to MicroBilt, PAF, Burgess and Wojciechowski.

109. At all times relevant and during the course of the Conspiracy, the False Information expanded into additional lies and false statements about MicroBilt, PAF, Burgess and Wojciechowski being made not only by Farrell and Szostak, but also by each of the other Third Party Counterclaim-Defendants (as detailed herein), all in an effort to attempt to cause financial damage to MicroBilt, PAF, Burgess and Wojciechowski.

110. As a direct result of the dissemination of the foregoing False Information by Farrell, Szostak, West, Bernstein, Barrile and others to the SEC, the SEC commenced an investigation in early Spring 2017 and ultimately filed a civil complaint in June 2021 (the "SEC Complaint").

111. Similarly, as a direct result of the dissemination of the foregoing False Information to Virginia Counsel, as set forth in greater detail below, who Farrell and Szostak affirmatively sought and identified as having brought a case against MicroBilt and Burgess wherein Burgess had been dismissed, such Virginia Counsel reinitiated efforts, and in fact secured the right to reconsider whether, to maintain a litigation claim against Burgess in a Virginia federal litigation that had already been dismissed by that federal court for lack of personal jurisdiction thereby creating several additional years of unnecessary and costly litigation efforts against both MicroBilt and Burgess.

112. Farrell and Szostak asserted False Information to Virginia Counsel including making inaccurate claims about Burgess's alleged majority ownership interest of MicroBilt that

directly resulted in those same allegations being asserted by Virginia Counsel and ultimately adopted by the Virginia federal court as a basis for its granting of Virginia's Counsel's reconsideration motion leading to two years of unnecessary but hotly contested jurisdictional discovery.

113. Likewise, as a direct result of the dissemination of the foregoing False Information to the same Virginia Counsel, such Virginia Counsel filed a false and factually unsupported RICO-Alleged Class Action lawsuit (the "Class Action Complaint") against Counterclaim Plaintiffs, Burgess, Wojciechowski, and others, that was later withdrawn within less than 20 days because it became apparent to Virginia Counsel that the False Information being spread Farrell, Szostak and the other Third Party Counterclaim-Defendants could not sustain the continued prosecution of such Class Action Complaint.

114. As part of the ongoing vendetta and fraudulent schemes, including the False Scheme described hereafter, Szostak repeatedly sent and published threatening and harassing texts to various PAF employees and former employees repeating the foregoing lies. The texts threatened criminal actions, threats of and innuendo that SEC is willing settle for a confession on the False Information, an Armageddon of civil litigation and loss of careers.

115. As a result of Farrell's and Szostak's actions in creating knowingly false spreadsheets, circulating them to PAF and PAF's officers and telling lies, without limitation, to the False Information Recipients, as well as the concomitant efforts by the Third Party Counterclaim-Defendants to disseminate and publish the False Information as part of the False Scheme as well as violate, and aid and abet in the violation, of the contractual and statutory non-disclosure duties of Farrell, Szostak, Nanda and Barrile, MicroBilt and PAF have been damaged in excess of $30,000,000, including lost profits and unnecessary litigation costs and attorneys' fees

defending against the increased litigation process imposed on MicroBilt and PAF by tortious conduct of Farrell and Szostak and the other Third Party Counterclaim-Defendants.

**D.      Farrell And Szostak's Other Wrongful Conduct**

116.    Farrell's wrongful conduct came in full focus in October 2015 when he and Szostak began plans to start a new hedge fund to compete against PAF.

117.    Around October 28 and October 29, 2015, despite their positions as Managing Members at PAF, Farrell and Szostak approached Nanda, who was in charge of credit scoring and analytics as an EVP for PAF, to see if Nanda would be interested in leaving PAF and performing analytics for them in a new hedge fund.

118.    It was at this same time that Szostak was downloading client and prospect lists and emailing them to his home.

119.    Szostak's conduct in fulfillment of his job responsibilities was equally as egregious as Farrell's conduct.

120.    Szostak would regularly change marketing materials and investor documents without any marketing review, or legal or compliance oversight. To make matters worse, Szostak would utilize his daughter, a college student, to prepare investor decks and marketing materials and would alter the company's website despite the fact that PAF had marketing and compliance professionals responsible for these activities.

121.    Marketing documents and investor materials became a constant source of contention at PAF under Farrell's and Szostak's tenure.

122.    Szostak would spend hours changing already written and agreed upon content for materials, then would distribute his new versions which were filled with errors.

123.    When errors were pointed out and corrected, Szostak would become loud, defensive and abusive and prepare a revised interpretation, filled with more errors, resulting in a repeat of the unproductive cycle he initiated.

124.    Szostak also would abuse his position by using trade shows he attended on behalf of PAF as an excuse to take his wife on vacation with him.

125.    While these trade shows were an opportunity to generate leads for PAIF, Szostak would utilize them and PAF's booth to promote his wife's business of selling corporate marketing giveaways.

126.    Szostak, who was supposed to be responsible for generating investors for the fund, refused make phone calls to prospect for investors. Instead, Szostak would simply send a LinkedIn invitation with the hope of generating a response.

127.    No response ever came.

128.    Faced with the inability to generate investor interest, Szostak turned to trying to take credit for the work of others.

129.    Farrell was complicit in these actions as he directed PAF's marketing personnel to change contact information for all marketing materials so that all prospective investors and customers leads went to Szostak -- with whom Farrell was scheming with to start a competing fund.

130.    While Szostak purports to take responsibility in the Complaint for obtaining the largest investor in PAIF, that investment was initiated by Robert Wade ("Wade").

131.    After Wade brought in the investor, Farrell and Szostak subsequently attempted to deprive Wade of commissions for the investment Wade initiated by altering Wade's commission agreement and trying to give Szostak credit for the commission.

132.    Wade, who would make up to forty calls per day to develop relationships with potential investor prospects, was instructed by Farrell to cease any further contact with the relationships Wade developed for a period of approximately 3-6 months so Szostak could have the ability to develop relations with these same investors.

133.    To make matters worse, both Farrell and Szostak instructed Wade not to call or waste his time calling certain classes of potential clients in order to sabotage PAF.

134.    Szostak also spent significant time travelling the country to speak at peer-to-peer and marketplace lending conferences.

135.    PAF, however, was not in the peer-to-peer or marketplace lending business, but in the alternative financing business. This fundamental misunderstanding of PAF's business was indicative of Szostak's unsuccessful tenure at PAF.

136.    While at PAF, Szostak grew more and more paranoid about his performance and Szostak had a habit of listening in on various internal and external conference calls between MicroBilt and PAF employees without identifying himself in order to gain access to Confidential Information.

137.    Szostak also would routinely fight with Farrell and other employees in the office. Szostak would engage in shouting matches with Farrell that often became quite confrontational and verged on becoming physical.

138.    Moreover, when employees questioned actions taken by Farrell or Szostak, they would respond with profanity, threats and intimidation in an attempt to either get their way or cover up their wrongful conduct.

139.    Employees in the office stated that when Farrell and Szostak were employed, the office atmosphere was chaotic, hostile and intimidating.

140. After they were terminated, MicroBilt's Senior Vice President of Marketing described working with Farrell and Szostak as an environment where yelling, cursing at the top of your lungs and throwing temper tantrums through the office on a daily basis was considered normal. This same SVP also stated that on multiple occasions he thought they were going to start a fight and was ready to call the police.

141. MicroBilt's Vice President and Controller, who worked for the organization for twenty-years, threatened to quit because of Farrell's and Szostak's inability to grasp simple concepts, follow procedures or work with others.

142. MicroBilt's Human Resources Director, whose cubicle was near Szostak, found it difficult to concentrate because of the way Farrell and Szostak interacted with each other and with other employees. The Human Resources Director said that she feared for her safety and received complaints from others who found it difficult to work in the environment Farrell and Szostak created.

143. Employees also asked to have their desks moved away from Farrell and Szostak to get away from the environment.

144. Things came to a head in December 2015, when Farrell and Szostak sent a letter to PAF threatening to quit and threatening to approach PAF's largest investor and get it involved in their dispute.

145. In response, on January 4, 2016, PAF terminated Farrell and Szostak from their positions for cause.

146. Their termination letter states, in relevant part, that Farrell and Szostak were terminated because they "put [their] own personal interests ahead of PAF's, and threaten to involve [PAF's largest investor]."

147. The termination letter documented that Farrell's and Szostak's "work productivity for PAF has been grossly inadequate," they "failed to follow directions and reasonable guidance," their conduct was "contrary to the initial understanding of all [PAF's] Members, counterproductive, insubordinate, and in breach of their fiduciary duties."

148. Finally, the termination letter noted that Farrell and Szostak conducted themselves in an "unprofessional manner," and had made "threats to sue, leave and compete with PAF, go to a competitor for analytics, and solicit other personnel."

149. After their terminations, MicroBilt, as PAF's other member, was left to deal with the mess and remedy the sabotage efforts of Farrell and Szostak.

150. When PAF was formed, the model the members discussed was to have a fund consisting of multiple smaller investors.

151. Farrell and Szostak were either incapable of attracting investors, or worse still, conspiring to attract investors for their own planned hedge fund, as opposed to PAIF. Farrell's and Szostak's gross negligence and intentional actions left PAF severely damaged.

152. Farrell and Szostak had not raised investor funds to support operations and they failed to fulfill their responsibilities to ensure borrowers were submitting proper documentation and that there was adequate collateral in place to secure amounts that PAIF advanced.

153. As a proximate result of Farrell and Szostak's conduct, between January 2016 and the present, MicroBilt had to contribute in excess of $2.2 million to keep PAF operational and generating investor returns and PAF has suffered millions of dollars in damages from borrowers' fraud.

154. In short, Farrell, with Szostak's assistance, damaged MicroBilt and PAF through intentional acts and gross negligence.

**Additional Background Facts Supporting
State Law Claims Against All Defendants**

155.    Farrell and Szostak and the other Third Party Counterclaim-Defendants violated the statutory and common law of New Jersey by the commission of various business torts against MicroBilt and PAF, including without limitation, the tortious interference with contracts, the direct breaching, and aiding and abetting the breaching, of various fiduciary and non-disclosure duties owed by Farrell, Szostak, Nanda and Barrile to MicroBilt and PAF, and the commission of trade libel/commercial disparagement against MicroBilt and PAF.

156.    Each Third Party Counterclaim-Defendant further acted in agreement and with conspiratorial intent to financially cause harm to MicroBilt and PAF by not only interfering with MicroBilt's and PAF's contractual and prospective relationships with investors, customers, and prospective investors and customers, but further by disclosing, and aiding abetting the disclosure of, the Confidential Information to unauthorized third parties in order to enrich themselves as set forth below, as well as to disseminate the False Information to the False Information Recipients.

157.    In addition, these same Third Party Counterclaim-Defendants, by committing the various violations of New Jersey Statutory and common law and the breaching, and aiding and abetting the breaches, of various fiduciary and non-disclosure duties, similarly engaged in a wide-ranging conspiracy in violation of the New Jersey common law with respect to their involvement in and association with the Conspiracy.

158.    As to the conspiracy claims, Counterclaim-Defendants and Third Party Counterclaim-Defendants colluded, conspired and committed multiple predicate incidents demonstrating and confirming an agreement by each Third Party Counterclaim-Defendant with Farrell and Szostak to cause financial harm to MicroBilt and PAF through the concerted and repeated dissemination of both the Confidential Information and the False Information about MicroBilt, PAF, Burgess, Wojciechowski and others to other third parties (the "False Scheme"), including, without limitation, the False Information Recipients, that had the intended purpose of

30

increasing regulatory investigations and oversight, regulatory complaints, public disrepute and acrimonious private litigation against MicroBilt, PAF, Burgess, Wojciechowski and others.

159.   As described hereafter, All Defendants implemented, executed and participated in the False Scheme in various manners and methods through the occurrence and completion of various predicate incidents, as set forth *infra*, that constituted an agreement to commit these acts over a lengthy period of time starting in early 2017 and continuing through to the present.

160.   All Defendants designed the False Scheme in such a manner so as to attempt to cause Counterclaim Plaintiffs to fail under the weight of increased governmental oversight and investigations, regulatory complaints and frivolous, costly and unnecessary litigations, all of which All Defendants maliciously promoted and encouraged through the repeated dissemination of the False Information about innumerable topics about which All Defendants knew or should have known were false and without any verifiable foundation.

161.   Each Third Party Counterclaim-Defendant aided and intended to further the Conspiracy and other conspirators in the False Scheme each time that they participated in the dissemination of the Confidential Information and the False Information to the third parties, including, without limitation, the False Information Recipients.

### Conspiracy

162.   The Conspiracy in this case (the "Conspiracy"), as defined by and pursuant to 2C:41-1(c), is an association-in-fact enterprise consisting of All Defendants to participate in and promote the False Scheme.

163.   At all times relevant from early 2017 through to the present, each Third Party Counterclaim-Defendant agreed to and did conduct and/or participate, and continues to conduct and participate, either directly or indirectly, in the Conspiracy's affairs through an agreement with Farrell and Szostak to commit acts in furtherance of the Conspiracy.

31

164. The Conspiracy had the common shared purpose of All Defendants seeking to enrich and benefit themselves by effectuating the False Scheme to cause financial harm to MicroBilt and PAF through the dissemination of both the Confidential Information and the False Information.

165. All Defendants hoped to achieve a financial reward either by knowingly falsely (i) advocating for an SEC whistleblower investigation and complaint against MicroBilt and PAF that would result in a whistleblower award (the "Whistleblower Award") against MicroBilt, PAF, Burgess, Wojciechowski and others, that would be shared among the Third Party Counterclaim-Defendants and/or (ii) creating improper competitive advantages for Keycap Funding, Princeton Lenders, Crossbow Capital (and other similar future business ventures) begun by Farrell and Szostak, which All Defendants hoped would achieve financial success by both utilizing the Confidential Information as well as through the dissemination of the False Information.

166. To accomplish their goals, each Third Party Counterclaim-Defendant participated in the activities of the Conspiracy because they engaged in, and otherwise aided and abetted in, acts that they knew would perpetuate the False Scheme set forth herein, including, without limitation the concerted and repeated (i) disclosure of the Confidential Information as well as (ii) the dissemination of the False Information, all in an effort to cause financial harm to MicroBilt, PAF, Burgess, Wojciechowski and others.

167. The Conspiracy continued for a significant period of time beginning as early as January 2016 and continuing to the present. (As noted *supra*, MicroBilt and PAF only recently received the New Discovery which revealed the tortious behavior of the Third Party Counterclaim-Defendants and the conspiracy to commit the False Scheme with Farrell and Szostak).

168. Specifically, these Third Party Counterclaim-Defendants, at various times, and through various methods and manners, as set forth *infra* with particularity against each Third Party

Counterclaim-Defendant, maliciously with conspiratorial intent committed the following predicate incidents that had as their objective the effectuation of the False Scheme, namely to cause the financial damage to MicroBilt and PAF (as well as bringing professional and personal harm, discredit and disrepute on Burgess and Wojciechowski) and to assist in the financial success of Keycap Funding and other ventures that were competitive with and that could use the Confidential Information to their financial advantage:

- the delivery of both False Information and Confidential Information to the SEC to improperly instigate an SEC investigation and complaint of MicroBilt, PAF, Burgess, Wojciechowski and others;

- the delivery of Confidential Information to Keycap Funding, and other unauthorized third parties and business ventures, for the competitive advantage of the owners of Keycap and those who provided professional services to Keycap;

- the delivery of False Information and Confidential Information to Virginia Counsel in order to cause the revival of the already dismissed action against Burgess based upon False Information and thereby promote the initiation of additional litigation strategies and process, including the filing of a false RICO class action, against the MicroBilt, PAF, Burgess, Wojciechowski and others;

- the delivery of False and Confidential Information to Ranger, Hacker and Katsiff, and Ranger's collective efforts to impose financial harm on the MicroBilt, PAF, Burgess, Wojciechowski and others, through an acrimonious arbitration and as well as repeated Ranger's re-publication of the False Information to the SEC, all in an effort by Ranger to conceal their own wrongful conduct with regard to Ranger's investments in PAIF;

- the delivery of False Information and Confidential Information to Bruce Goldstein, the PAIF Bankruptcy Trustee[2] and the Argon Bankruptcy Trustee in order to cause financial harm to MicroBilt, PAF, Burgess, Wojciechowski and others; and

- the delivery of the Confidential Information and False Information to the nationally-recognized Hedge Fund Reporter in an effort to promote publicly accessible articles and information demeaning and denigrating MicroBilt, PAF, Burgess, Wojciechowski and others.

---

[2] In March 2018, PAF and PAIF filed a voluntary petition in New Jersey bankruptcy court.

- the dissemination by Copley and Sarah of the Confidential Information and False Information, including litigation materials containing the Confidential Information whose confidentiality was then the subject of a pending court application, to members of the financial press, including the Hedge Fund Reporter, Pageant Media, AltFi, debanked.com and The Wall Street Journal, in an effort to promote, encourage, and/or cause the publication and dissemination of publicly accessible articles and information demeaning and denigrating MicroBilt, PAF, Burgess, Wojciechowski and others, and, in particular, but without limitation, to route such materials to the portfolio manager of Ranger, PAIF's principal investor, with the intent of causing financial harm to MicroBilt and PAF.

169.    During the commission of these predicate incidents, not only did certain Third Party Counterclaim-Defendants violate various direct fiduciary and non-disclosure duties owed to the MicroBilt and PAF, either contractually, statutory and/or at common law, but each Third Party Counterclaim-Defendant aided and abetted the violation of these various duties directly held by other Counterclaim-Defendants and/or Third Party Counterclaim-Defendants.

170.    Specifically, the following All Defendants either directly violated, or aided and abetted in the violation of, the following duties owed to the MicroBilt and PAF:

- Farrell, Szostak and Nanda breached their respective duties of fiduciary care and loyalty to MicroBilt and PAF;

- Farrell, Szostak, Nanda and Barrile breached their respective contractual, statutory and common-law duties of non-disclosure and confidentiality, all consistent with their respective agreements, New Jersey Trade Secrets Act and the Third Restatement of Unfair Competition's confidentiality principles; and

- Farrell, Szostak, Nanda, Baldo, West, Barrile and Bernstein aided and abetted, and further conspired to, the breach and violation of these fiduciary duties and duties of non-disclosure and confidentiality.

171.    As noted, All Defendants committed these predicate incidents and violated these various duties because they were each motivated, without limitation, by the potential pecuniary gain that each Third Party Counterclaim-Defendant hoped to achieve, earn and collect from either or both of the following potential recoveries:

34

i.   **Whistleblower Award** – Farrell, Szostak, West and Barrile, as well as Bernstein and Baldo, upon information and belief, all believe that they stand to gain financially by earning a portion of any Whistleblower Award that might be achieved or hastened by their involvement in the Conspiracy and False Scheme through (i) the SEC's investigation of and complaint against MicroBilt, PAF, Burgess, Wojciechowski and others and (ii) MicroBilt's and PAF's financial demise; and

ii.   **Keycap Funding/Princeton Lenders/Crossbow Capital (or similar future business ventures which rely upon the misappropriated Confidential Information)** – Farrell, Szostak, Baldo and Nanda all believe that they stood and stand to gain by the growth of Keycap Funding, Princeton Lenders and/or Crossbow Capital (and any other business venture that would use the Confidential Information) as competitive with MicroBilt and PAF, and such success was being achieved through or otherwise hastened by the causing of financial harm to MicroBilt, PAF, Burgess, Wojciechowski and others.

172.   Pursuant to and in furtherance of the False Scheme, and as a direct result of the unauthorized publication of the Confidential Information and repeated and malicious dissemination of the False Information to, without limitation, the False Information Recipients, All Defendants jointly cooperated in the commission of multiple predicate incidents in furtherance of the False Scheme.

**SEC Investigation And**
**Subsequent SEC Complaint**

173.   As noted earlier, in early 2017, Farrell and Szostak initially spread the False Information to the SEC in order to encourage an SEC investigation and then an SEC complaint in hopes of achieving a Whistleblower Award.

174.   However, Farrell and Szostak were not content with just providing relevant information to the SEC, but instead turned toward the dissemination of the False Information alone to the SEC and then to multiple other parties, and then thereafter, upon information and belief, with a promise of a share in the Whistleblower Award, or through the payment of attorneys' or other professional fees, further conspired with, as additional members of the Conspiracy, each Third Party Counterclaim-Defendant to similarly disseminate and publish the False Information

35

and otherwise support the sustained repeated efforts to attempt to cause financial damage to MicroBilt and PAF through the dissemination of the False Information to the SEC and other third parties.

## Farrell's and Szostak's Symbiotic Relationship With Ranger, Its Counsel And The SEC

175. As documented by the factual allegations set forth in detail hereafter, Farrell and Szostak engaged in a multi-year effort to disclose Confidential Information and spread the False Information to Ranger and Ranger's counsel.

176. In fact, Ranger and Hacker, Ranger's General Counsel, and Katsiff, Ranger's outside counsel, instigated, promoted and encouraged this relationship with Farrell and Szostak in order to further prompt the SEC into pursuing an investigation and ultimately to file its complaint against MicroBilt, PAF and others.

177. As early as March 2016, Farrell and Szostak were meeting with Hacker, Ranger's General Counsel, in New York, and they were freely sharing and exchanging with each other both Confidential Information and False Information about MicroBilt, PAF, Burgess, Wojciechowski and others.

178. At one point, Ranger paid Farrell and Szostak's legal fees for this litigation and further facilitated Farrell's and Szostak's initial contact with the SEC where Ranger's outside counsel advised the SEC's counsel to contact Farrell and Szostak.

179. In fact, the SEC's investigation did not begin until 2017 and occurred as a direct result of Ranger's efforts and the joint efforts of Farrell, Szostak, West and Barrile to exchange False Information with the SEC.

180. Farrell and Szostak, given their deep access to the SEC's counsel through Ranger, Ranger's outside counsel and West as well as their direct communications with the SEC's counsel,

made repeated harassing statements and threatening texts to PAF's principals and flaunted their inside information about the SEC's on-going "not-so-secret" investigation.

181.    As a result of their relationship with Ranger and Ranger's outside counsel, Farrell and Szostak at times even knew about witnesses that the SEC intended to depose and the dates of those depositions, before subpoenas were even served on witnesses or their counsel.

182.    The False Information being peddled to the SEC by Ranger as well as by Farrell, Szostak, West and Barrile, included, without limitation, false allegations (a) that Burgess stole as much as $12M through prohibited transfers to MicroBilt and MicroBilt's affiliates, (b) that MicroBilt fraudulently earned significant multimillion dollar fees from PAIF's clients, (c) that Ranger was unaware of Burgess's involvement in PAF and (d) that Burgess secretly controls PAF.

183.    Farrell, Szostak, West and Barrile (as well as Ranger) knew that these false allegations had already been (i) rejected by an arbitration panel in an arbitration involving Ranger and PAF, (ii) rejected by the PAIF Bankruptcy Trustee, (iii) rejected by the federal bankruptcy judge presiding over the PAIF bankruptcy, and (iv) otherwise actively disproved by the discovery produced by PAF during that arbitration and otherwise known by Farrell, Szostak, West and Barrile.

184.    Farrell, Szostak, West and Barrile knew that this False Information was false and unsubstantiated without evidentiary support, and yet they continued to promote this particular False Information to the SEC as though truthful and accurate, along with the other False Information that they disseminated to the SEC and exchanged with Ranger and its outside counsel (as set forth hereafter).

185.    Ranger's and its outside counsel's deep involvement in and apparent control over the management of (i) the SEC's investigation, (ii) the SEC's decision to file a complaint and (iii) the SEC's manner and methods of discovery is well documented and was co-extensive with and

otherwise ran parallel to the conspiratorial efforts of Counterclaim-Defendants and Third Party Counterclaim-Defendants to effectuate the False Scheme to cause financial harm to MicroBilt, PAF, Burgess and Wojciechowski.

**Dissemination To Bruce Goldstein
And Argon Credit's Bankruptcy Trustee**

186.    Farrell and Szostak further disseminated the False Information to Bruce Goldstein ("Goldstein"), a well-connected short term consumer loan and distressed lending industry professional and the owner/managing member of Alhambra Circle Partners, LLC ("Alhambra Partners"), over several years.

187.    Goldstein had provided financial broker services to Argon Credit, as a borrower of PAIF loans.

188.    Farrell and Szostak used Goldstein as a sounding board for their collective efforts to cause financial harm to MicroBilt, PAF, Burgess, Wojciechowski and others.

189.    In fact, very early in January 2017, Farrell and Szostak and Goldstein were in communications with each other (using email addresses from both Gmail and Crossbow Capital) regarding an investor that Farrell and Szostak had for Crossbow Capital and a business idea that Goldstein was suggesting to them and was competitive to PAF and PAIF.

190.    By email, dated January 23, 2017, Goldstein solicited Farrell and Szostak to discuss a business venture with the investor "to create something similar (better) than the Princeton/MicroBilt relationship … maybe we can recreate the idea, but make it better … ."

191.    At this same time, in February 2017, Farrel and Szostak were in other communications with Goldstein regarding the bankruptcy of Argon Credit, and efforts to undercut MicroBilt's and PAF's position as a creditor in that Argon Bankruptcy.

192.    Specifically, Farrel and Szostak solicited Goldstein's assistance with a personal introduction to Deborah K. Hebner, the Argon Credit's bankruptcy trustee at that time (the "Argon

Bankruptcy Trustee"), as well as the delivery of a copy of Farrell's and Szostak's lawsuit in this case.

193. Goldstein delivered the New Jersey complaint to the Argon Bankruptcy Trustee, vouched for Farrell and Szostak stating to the Argon Bankruptcy Trustee that "both Bert and Bob could provide you with a unique inside perspective regarding Princeton" and providing Szostak's cell phone number.

194. Goldstein copied Szostak on that email.

195. Upon information and belief, Farrell and Szostak had telephonic and email communications with the Argon Bankruptcy Trustee wherein Farrell and Szostak disseminated False Information in an effort to undercut MicroBilt's and PAF's efforts to effectively manage their losses in the Argon Credit bankruptcy.

196. Thereafter, in February 2018, Szostak enlisted Goldstein's services again by sending him a PAF spreadsheet containing Confidential Information that regarded highly detailed financial records and projections for PAF and suggesting wrongdoing by PAF as regarding Think Finance, a distressed lender.

197. Thereafter, a few months later, by email, dated March 15, 2018, Szostak advised and disclosed to Goldstein that the SEC was investigating MicroBilt and PAF, suggesting that the SEC is "all over" MicroBilt and PAF and that it is ready to "pounce."

198. Goldstein, being hyped by Szostak's email, retorted with his own email a few minutes later: "That's great to hear w SEC. Nuttin like a good old fraud, perpetuated by a seasoned fraudster."

199. By email, dated March 15, 2018, Szostak then prompted Goldstein further when Szostak stated with regard to the unknown SEC investigation" "has to mean something that their spending time calling people, rights?"

200. In response, by email, dated March 15, 2018, Goldstein stated: "Without a doubt my friend. Walls are moving in with no place left to go … ."

201. Later in March 2018, Szostak circulated to Goldstein both (i) financial schedules from PAIF's bankruptcy and (ii) an article written by the Hedge Fund Reporter that was fueled by False Information disseminated to the Hedge Fund Reporter by Farrell and Szostak.

202. There were additional communications in September and December 2018 wherein Farrell, Szostak and Goldstein shared False Information.

203. In the December 2018 communications, Goldstein sent emails directly to Szostak's email address for their separate entity, "**Lead Hero 4 Sales**."[3]

204. Farrell's and Szostak's cavorting and communications with Goldstein had the purpose of leveraging Goldstein's position in the industry to bring ill-repute to MicroBilt and PAF in furtherance of the False Scheme.

### Virginia Litigations

205. In addition to the delivery of the False Information to the SEC and industry professionals such as Bruce Goldstein and Alhambra Partners, Farrell, Szostak and other Third Party Counterclaim-Defendants affirmatively sought out and intentionally approached Virginia Counsel in an effort to convince Virginia Counsel that they should expand their litigation efforts in a Virginia federal court (the "Virginia Court") litigation against MicroBilt and Burgess wherein both MicroBilt and Burgess were named defendants but where the Court had already deemed that it did not have personal jurisdiction over Burgess.

---

[3] Farrell and Szostak, along with Szostak's spouse and daughter, own, operate and control (as owners, founders and/or executives) other business entities, including without limitation Lead Hero, LLC, PC Social, LLC dba Lead Hero 4 Sales, and Present Company, LLC. In addition to the email from Goldstein to Szostak's LeadHero4Sales email address noted, there are other emails, texts and LinkedIn messages that suggest that Farrell and Szostak, and possibly the other family members, were using the assets of these entities to further the False Scheme to cause financial harm to MicroBilt, PAF, Burgess and others. For these reasons, the Counterclaim Plaintiffs reserve to the fullest extent, and do not waive, their rights to pursue claims against these potential co-conspirator entities and family members should further discovery reveal more sinister involvement in the False Scheme. Any legal process against Szostak's spouse shall comply with all procedural and substantive rules governing her Florida bankruptcy proceedings.

206. For example, by email, dated June 15, 2020, Szostak spread False Information to Virginia Counsel that MicroBilt was majority-owned by the Burgess family and "much more", when Farrell and Szostak knew or should have known that this information was false.

207. Farrell and Szostak also enlisted the assistance of Bernstein to spread the False Information and coordinated a meeting and communications between Bernstein and Virginia Counsel.

208. As a result of the malicious efforts of Farrell and Szostak and Bernstein to spread False Information, Virginia Counsel renewed and doubled their efforts to seek the Virginia Federal Court's reconsideration of the Virginia Federal Court's dismissal of Burgess using the False Information that Farrell, Szostak and Bernstein had peddled to Virginia Counsel.

209. Specifically, as a result of this False Information, Virginia Counsel, as described elsewhere herein, asserted to a Virginia Federal Judge that Burgess had lied about his ownership and control of MicroBilt and, as a result, that Virginia Federal Judge re-opened the Court's decision to dismiss Burgess and instead ordered lengthy and costly jurisdictional discovery into Burgess's purported ownership and control of MicroBilt.

210. In fact, by text, dated September 14, 2020, when Farrell and Szostak learned that the Virginia Federal Judge had reopened the case against Burgess, Farrell and Szostak acknowledged that they were responsible for giving the False Information to Virginia Counsel that led to renewed litigation in Virginia against Burgess:

> 2020-09-13 15:43:56 UTC <"+1 609-731-4513">: Williams V MicroBilt- they seem to be holding their own. **Judge granted trial to be moved to jersey because Burgess is only a consultant to microbilt. Last month Williams attorney filed motions for judge to reconsider order because new discovery showed Burgess misrepresented his involvement with microbilt in a declaration by Walt he revealed burgesses family owned microbilt**. The judge reconsider his order based on this new evidence and the case stays In Virginia. That's big because jersey judges r in lawyers pockets in my opinions
> 2020-09-13 15:45:56 UTC <"+1 609-731-4513">: Maybe judge ruling Burgess is contrlbpetson is worth an update to Larry. I'll send it

2020-09-14     00:23:33     UTC     <Local     Device     <DB-0e25414a8651bfdb2b5fe2ddac856d31>>: **I'm the one that gave them that information in the argon transcripts**
2020-09-14 12:31:13 UTC <"+1 609-731-4513">: That's fricken awesome. **I remember that**
2020-09-14 12:33:37 UTC <"+1 609-731-4513">: **Nothing like having ur lawyers be part of the judges hometown boys**

(verbatim texts inclusive of grammar and spelling errors) (emphasis supplied).[4]

211.   As a result, the Virginia Court permitted Virginia Counsel to engage in a lengthy two-year jurisdictional discovery battle that mired MicroBilt and Burgess in unnecessary expensive litigation which was initiated solely as the result of Farrell's, Szostak's and Bernstein's delivery of the False Information to Virginia Counsel.

212.   Similarly, at this same time, Farrell, Szostak and Bernstein further fed other False Information to Virginia Counsel that caused Virginia Counsel to file the Class Action Complaint in the Virginia Court against MicroBilt, PAF, Burgess, Wojciechowski and others.

213.   As noted earlier, in early 2017, Farrell and Szostak initially spread the False Information to the SEC in order to encourage an SEC investigation in hopes of achieving a Whistleblower Award.

214.   However, in this case, the purpose of the dissemination of the False Information to Virginia Counsel was increasing the legal process against, and thereby to cause financial harm to, PAF, MicroBilt, Burgess and Wojciechowski by causing an increase of legal fees and costs predicated upon the False Information.

### Other Categories Of False Information Disseminated And Published Through Various Predicate Incidents By Various Defendants

215.   During the False Scheme, All Defendants disseminated and published the False Information that included additional False Information about various topics and categories of

---

[4] The texts originating from phone number "609-731-4513" is associated with Farrell whereas the other texts are from Szostak.

information about the purported business practices of MicroBilt, PAF, Burgess and Wojciechowski, all in an effort to cause financial harm to MicroBilt, PAF, Burgess and Wojciechowski.

216.    The wide ranging additional categories of False Information included statements and lies regarding MicroBilt, PAF, Burgess and Wojciechowski including, without limitation, the following topics and issues: (i) Argon Credit; (ii) Bristlecone; (ii) Ranger; (iii) Green Circle; (iv) Shoreside; (v) Rosebud Lending, a client of PAIF (and a subsidiary of REDCO, the economic development arm of the Rosebud Sioux Tribe);[5] (vi) Rosebud Management which is owned by MicroBilt Financial Services, LLC, and that acted as a service provider to manage PAIF's relationships with its clients, including Rosebud Lending; (vii) Bank of America; (viii) Fund Administration; and, generally, (ix) additional false statements asserting purported falsity of financial reporting, returns on investment, restatements of financials, assets under management, default rates, interest rates, performance and a multitude of other pejorative false statements about MicroBilt and PAF.

### Farrell's & Szostak's Participation In The False Scheme

217.    Farrell and Szostak, through the United States mail, emails and telephonic discussions directly to and with the False Information Recipients, and/or with other third parties, through their agents and representatives (*i.e.*, each Third Party Counterclaim-Defendant), violated the New Jersey statutory and common law by without limitation, the following predicate incidents that formed, along with the other predicate incidents of the Third Party Counterclaim-Defendants, the agreement to participate in the Conspiracy and effectuate the False Scheme:

> i.    In March 2016, after their termination, Farrell and Szostak met and communicated with Hacker, as inside General Counsel to Ranger, disclosing Confidential Information and spreading False Information in

---

[5] Rosebud Lending is not the same as Rosebud Management which is owned by MicroBilt Financial Services, LLC, and that acted as a service provider to manage PAIF's relationships with its clients.

an effort to cause disruption in and interfere with the relationship between PAF, MicroBilt and Ranger;

ii. By email, dated March 30, 2017, Szostak, with a copy to Farrell and West, advised the SEC's counsel (i) that Farrell and Szostak were speaking with Barrile, a consultant hired by MicroBilt to work with Fund Recovery Services, the successor in interest to PAIF regarding the Argon bankruptcy, and (ii) that PAIF was illegally collecting loans in state jurisdictions which it was not licensed and that therefore it was violating the law under the auspices of PAF, MicroBilt, Burgess and Wojciechowski which was false on all levels;

iii. By email, dated March 28, 2017, Farrell communicated with the SEC and Hacker, Ranger's General Counsel;

iv. By email, dated April 14, 2017, Szostak sent an email to the SEC's counsel spreading False Information about PAF and PAIF and their financial reporting in an effort to support Farrell's and Szostak's whistleblower activities;

v. In August 2017, Farrell and Szostak used a friend at Anchor Capital to request a PPM from PAF and then falsely accused, through West, by email, dated August 23, 2017, to the SEC, that PAF failed to make proper disclosures about the arbitration with Ranger and the Ranger redemption of its investment in PAIF;

vi. By emails, dated October 12 and 13, 2017, Szostak sent emails to the Consumer Financial Protection Bureau, spreading False Information about MicroBilt and Burgess allegedly running a "Rent-a-Tribe" operation through their ownership of Rosebud Management that they falsely alleged was stealing funds from PAIF (which it was not);

vii. By email, dated February 26, 2018, Farrell and Szostak provided West with a supplemental submission to the SEC which included False Information about PAF, MicroBilt, Burgess, Wojciechowski and others and that included false accusations of financial mismanagement, all of which Farrell and Szostak knew would be shared with the SEC and which included False Information meant to cause financial harm;

viii. By email, dated April 22, 2018, Szostak challenged the veracity of PAF's financial reporting and provided False Information to Katsiff, Ranger's outside counsel, who was then representing Ranger which was then involved in an acrimonious arbitration against MicroBilt and PAF (the "Ranger Arbitration");

ix. In that same email, dated April 22, 2018, Szostak promoted to Ranger that it should use Nanda as a consultant because allegedly Nanda could

purportedly "substantiate" Ranger's false claims (Nanda could not) being asserted against the MicroBilt and PAF in the Ranger Arbitration;

x. In or about early and late March 2019 and early April, Farrell spoke to Katsiff attempting to peddle False Information to at least two attorneys acting as Ranger's outside counsel in the PAIF Bankruptcy in order to instigate additional litigation activities against MicroBilt, PAF, Burgess and Wojciechowski;

xi. By text, dated April 8, 2018, Farrell acknowledged to Szostak that, regarding their and Bernstein's efforts to instigate Ranger into increased litigation tactics against MicroBilt, PAF, Burgess and Wojciechowski, "One hand washes the other;"

xii. By email, dated November 9, 2018, in describing PAF, PAIF, MicroBilt and Ranger, Szostak spread False Information to a bankruptcy attorney, associated with Baldo's prior law firm, Stark & Stark, that Burgess was a "bad guy" who "secretly controls MicroBilt and stolen all the money;"

xiii. By another email, dated March 27, 2019, Farrell, with a blind carbon copy to Szostak, provided Katsiff as Ranger's counsel not only (i) confidential documents from Bernstein that Bernstein was not authorized to disclose but also (ii) innumerable false statements, self-servingly disguised as Farrell's opinions, about MicroBilt and PAF, Burgess and Wojciechowski, and in particular that falsely challenged, without limitation, the veracity of (i) PAF's financial reporting and projections, (ii) invoicing between MicroBilt and PAF, (iii) Burgess's declaration regarding Shoreside business transactions, (iv) Wojciechowski's testimony regarding Argon, (v) financial reporting regarding Green Circle, (vi) the financial relationship with Bristlecone, and finally (vii) PAF's relationship and financial reporting regarding the fees earned by Rosebud Management;

xiv. By email, dated June 15, 2020, Szostak spread False Information to Virginia Counsel that MicroBilt was majority-owned by the Burgess family and "much more" (as a result of this False Information, Virginia Counsel, as described *supra*, asserted to a Virginia Federal Judge that Burgess had lied about his ownership in and control over MicroBilt and, as a result, that Virginia Federal Judge re-opened the Court's decision to dismiss Burgess and instead ordered lengthy and costly jurisdictional discovery into Burgess's purported ownership and control of MicroBilt);

xv. By email, dated June 16, 2020, Szostak asserted False Information to Virginia Counsel regarding PAIF's and Burgess's business interaction with Balance Credit and Matt Martorello ("Martorello"), asserting that Burgess was "totally in charge" and that Burgess and Martorello absconded with $7M (as a direct result of this False Information,

45

Virginia Counsel filed a false and unfounded Class Action Complaint that associated MicroBilt, PAF, Burgess and Wojciechowski (and others) with illegal tribal lending schemes which, when challenged by a Federal Rule 11 safe harbor letter by MicroBilt's counsel, caused Virginia Counsel to withdraw the Class Action Complaint within less than 20 days because it was predicated on False Information);

xvi. By email, dated June 16, 2020, Szostak provided to Virginia Counsel the contact information for Bernstein so that Bernstein could speak (and upon information and belief Bernstein did speak with Virginia Counsel) directly with Virginia Counsel about the False Information being perpetrated and repeated by Farrell and Szostak to Virginia Counsel;

xvii. By telephone, on November 16, 2020, Farrell and Szostak spoke with Virginia Counsel and continued to falsely tell Virginia Counsel lies about the business dealings of MicroBilt and PAF, Burgess and Wojciechowski, including False Information on their purported business relationship to Big Valley Band of Pomo Indians of the Big Valley Rancheria, a federally recognized Native American tribe, all in an effort to attempt to further buttress with False Information the Class Action Complaint that had been filed and the false assertion that MicroBilt and PAF were operating an illegal "rent-a-tribe" operation;

xviii. By text, dated November 17, 2020, Farrel and Szostak were coordinating their communication with an attorney associated with Virginia Counsel and their discussion also touched upon Big Valley which was critical to the filing of the Class Action Complaint;

xix. By text, dated March 11, 2021, Farrell suggested to Szostak that they should "ask if burgess controls microbilt and if not has any court reconsidered jurisdiction based on evidence that supports otherwise" confirming that Farrell and Szostak knew precisely the nature of the False Information that Farrell, Szostak and Bernstein peddled to Virginia Counsel in order to instigate increased litigation process and jurisdictional discovery against MicroBilt, PAF, Burgess and Wojciechowski;

xx. By text, dated April 2, 2021, Farrell gleefully texted Szostak that "[t]hose southern boys [*i.e.*, Virginia Counsel] might be his Waterloo. They ain't goin away;"

xxi. On June 14, 2021, Farrell and Szostak were tracking the Virginia litigation that they had imbedded with False Information that had ignited unnecessary and costly jurisdictional discovery about Burgess's purported majority ownership of MicroBilt and texted each other because that Virginia litigation had gone quiet and "nothing['s] happening";

46

xxii. On June 26, 2021, Szostak texted Farrell advising that Szostak was speaking telephonically with the Hedge Fund Reporter feeding that Hedge Fund Reporter with False Information, all in an effort to destroy and disparage the trade reputation of MicroBilt, PAF, Burgess and Wojciechowski;

xxiii. On June 26, 2021, Szostak texted Farrell confirming that Szostak was speaking and disseminating False Information with Barrile regarding the SEC investigation;

xxiv. On July 3, 2021, Szostak revealed to Farrell by text his suggested strategy of deposing Wojciechowski in this litigation in order to "feed his answers to the SEC";

xxv. On July 19, 2021, Szostak suggested to Farrell by text that they each wear T-Shirts during their depositions that would read across their chests: "MicroBilt and Burgess accused by SEC of FRAUD" in order for everyone to see it if "they play the video during [the] trial;"

xxvi. By text, dated August 4, 2021, Szostak confirmed that Bernstein sent the SEC's counsel "everything;"

xxvii. By text, dated November 18, 2021, Farrell admitted that he "loved reminding the judge [in this case] the [SEC] charged them with fraud;"

xxviii. By text, dated November 23, 2021, Farrell gleefully commented that the "Williams class action complaint against [B]urges reads nice. He's a thug," thereby confirming Farrell's and Szostak's malicious intent to cause financial harm to MicroBilt, PAF, Burgess and Wojciechowski, by increasing the Virginia litigation against them;

xxix. By a series of texts from late November 2021, Farrell and Szostak admitted that they were working with Bruce Clark, Esquire, who had agreed to provide "behind-the-scenes" advice and "ghost" legal assistance in this litigation against MicroBilt and PAF;

xxx. By text, dated December 3, 2021, Farrell mocks that Burgess should "[s]pend some more money" and then later, by text, dated January 7, 2022, Farrell jokes that "Burgess is burning serious cash in eastern district of Virginia on Mann v. Gomez [*i.e.*, the Class Action Complaint]" where Farrell texted that Burgess was "being sued on [RICO] charges for breaking users laws from payday lending under the guise of an Indian tribe;"

xxxi. These statements made by Farrell demonstrates the malicious intent on the part of Farrell, Szostak and each Third Party Counterclaim-Defendant to cause financial harm to MicroBilt, PAF, Burgess and Wojciechowski by causing increased baseless litigation activities in

Virginia that relied upon False Information being provided by Farrell, Szostak and Bernstein;

xxxii.    On multiple occasions, Farrell and Szostak gleefully texted each other as to how their efforts to increase the litigation efforts by other third parties against MicroBilt, PAF, Burgess and Wojciechowski was part of their intended efforts to cause financial harm to them. For example,

- By text, dated December 18, 2018, Szostak texted Farrell "making em spend money;"

- By text, dated December 21, 2018, Farrell texted Szostak "Ed [Bernstein] making Burgess spend $;"

- By text, dated April 6, 2019, Farrell texted Szostak "More lawyrr fees for Phil to pay, what a shame;"

- By text, dated March 3, 2021, Farrell texted Szostak "Love seeing him lose no matter how small. He's spending money;" and

- By text, dated January 7, 2022, Farrell texted Szostak "Burgess is burning serious cash in eastern district of Virginia on Mann v Gomez; and, without limitation,

xxxiii.    All of the efforts by West and the other Third Party Counterclaim-Defendants to spread False Information was done so in agreement with and the active participation, knowledge and agreement of Farrell and Szostak.

**West's Participation In The False Scheme**

218.    West, through the United States mail, emails and telephonic discussions, in coordination and agreement with Farrell and Szostak, and at all times on behalf of Farrell and Szostak and himself, and without limitation, through their agents and representatives (*i.e.*, the Third Party Counterclaim-Defendants), violated the New Jersey statutory and common law by without limitation, the following predicate incidents that formed, along with the other predicate incidents of the Third Party Counterclaim-Defendants, the agreement to participate in the Conspiracy and effectuate the False Scheme:

i.    West acted as a conduit of False Information from Farrell and Szostak to various third parties, including the SEC's counsel, and, not only

48

simply forwarded information as if such information were true (it was not), but further edited, revised and added his own commentary often asserting that the False Information he was disseminating was factual and accurate when such False Information was false, inaccurate and unsupported by any credible evidence;

ii. By email, dated, March 24, 2017, West forwarded to the SEC a Memorandum (the "Whistleblower Memorandum") that purported to set forth the "gist of the story and describing the players" and instead the Whistleblower Memorandum was a litany of lies, falsehoods, inaccuracies and misrepresentations meant to instigate the SEC to conduct an investigation and pursue a complaint against MicroBilt, PAF, Burgess, Wojciechowski and others;

iii. The Whistleblower Memorandum included a significant amount of False Information. Specifically, the submissions by Farrell, Szostak and West to the SEC (the "SEC Submissions") asserted irrefutable evidence (it was false) that PAF "intentionally mispriced" the value of Argon to hide losses and take $2M in performance fees and yet the SEC Submissions contain intentional and grossly reckless False Information including without limitation by:

- Willfully ignoring the necessity of structuring a side pocket to hold the Argon asset;
- Willfully ignoring basic accounting principles related to side pockets;
- Disregarding the necessity of having to write-down the side pocket and then having to continuously monitor the side pocket as more information is learned;
- Asserting the distribution of performance fees which never occurred;
- Failing to acknowledge that PAF lost money;
- Misstating the amount of assets under management;
- Misapplying the monthly gain to the side pocket;
- Failing to acknowledge the side pocket when calculating the performance fees;
- Asserting falsely that the PAIF had lent $77M;
- Asserting that the January 2017 testimony was false when it was not because the true losses were unknown at that time;
- Failing to appreciate the necessity of having to restate the side pocket as new information is learned; and
- Asserting falsely fraud in PAF's earning and willfully ignoring earnings mentioned were net of the side pocket losses that Ranger and the PAF shared and were cited as such on the tear sheets which were ignored by Farrell and Szostak.

49

iv.   By email, dated April 18, 2017, West provided False Information to the SEC's counsel;

v.   By email, dated April 30, 2017, West forwarded False Information to the SEC regarding Ranger and an entity called Bristlecone wherein West asserted falsely that MicroBilt, PAF and Burgess intentionally mismanaged the credit and other financial arrangements with Bristlecone;

vi.   By email, dated May 5, 2017, West forwarded False Information to the SEC asserting that PAF had restated its financials and intentionally misrepresented its returns, regarding various issues and entities, including Green Circle and Bank of America;

vii.   On this same date, in a clarification, West repeated to the SEC that PAF had restated its financial returns because, according to West, "[s]ome of those results they knew were false when they released them to the public" which was a lie and falsehood;

viii.   In a second effort at clarifying their position, by email dated May 5, 2017, West continued to spread False Information about PAF's financial reporting, and the involvement of MicroBilt and Burgess in those efforts, falsely asserting that PAF had "posted in January 2017 that the fund returned 15.8% for 2016" and that "PAF's website continues to represent falsely to investors that the fund made 15.8% for 2016;"

ix.   On the next day, by email, dated May 6, 2017, West continued to deliver False Information to the SEC as if it were fact, including False Information regarding the allegation that PAF was not properly reporting its losses regarding Green Circle, Bristlecone and Argon;

x.   By email, dated May 12, 2017, West delivered False Information to the SEC as if fact wherein West asserted that "[w]e are near certain Fundadministration is unaware of this $748,111.43 loss, which means PAF's recent audited results are fraudulent and PAF is continuing to hide losses and to post fraudulent returns to its investors;"

xi.   By email, dated May 18, 2017, West spread additional False Information to the SEC regarding PAF's financial reporting which West wrongly asserted was false and fraudulent (it was not);

xii.   By email, dated May 19, 2017, West admitted that he was not simply relaying information from Farrell and Szostak, but was actually editing the information that he was delivering to the SEC and thereby West was adopting as his own the accusations of False Information being disseminated to the SEC;

xiii.   In his May 19, 2017 email, West made false accusations about PAF and Fund Recovery's financial reporting activities;

xiv.   By emails, each dated May 25, 2017, West sent False Information to the SEC including false accusations about PAF's financial reporting regarding PAIF's assets under management and other false financial irregularities, including false allegations that PAF was not properly reporting its losses regarding Green Circle and Shoreside Loans;

xv.   By email, dated May 26, 2017, West made baseless accusations regarding PAF's and PAIF's financial reporting accusing them falsely of financial mismanagement and failing to make proper disclosures;

xvi.   By email, dated June 26, 2017, West falsely asserted to the SEC, as if fact, that Burgess was stealing funds from PAIF;

xvii.   By email, dated August 9, 2017, West delivered additional False Information to the SEC regarding Ranger and asserted, as if fact, as against PAF, MicroBilt and Burgess that "[t]he fraud continues;"

xviii.   By email, dated October 3, 2017, West forwarded False Information from Farrell and Szostak to the SEC accusing, *inter alia*, MicroBilt, Burgess and Wojciechowski of establishing Rosebud Management "to operate an illegal Rent-a-Tribe operation with Rosebud Lending" and further accusing Burgess of stealing, hiding and/or absconding with capital funds to which he was not entitled;

xix.   By email, dated November 14, 2017, to the SEC's counsel, West falsely accused Burgess, MicroBilt and PAF of committing fraud against Ranger by misusing Fund Recovery and misstating the financial records relating to the Argon portfolio (it had not);

xx.   By email, dated December 19, 2017, West sent an email to the SEC filled with False Information making accusations of fraud against MicroBilt, PAF, Burgess, exclaiming "MAJOR FRAUD going on here!," and "[w]e hope someone does something to stop Phil Burgess and crew;"

xxi.   In that same December 19, 2017 email, West, after providing False Information to the SEC, then requested from the SEC an "indication, on away or another, about whether you are actively working on this and considering recommending enforcement action to the Commission;"

xxii.   By email, dated December 22, 2017, West provided an update to the SEC's counsel stating that he was providing "facts" including how allegedly Burgess and Wojciechowski falsely "testified to losses in court then intentionally hid them from PAIF investors" (they had not);

51

xxiii.  In that same December 22, 2017 email, where West asserted that he was providing the SEC with "facts," West spread additional False Information that was inaccurate and false including that "Burgess is siphoning off all the extra money these high interest loans are making and funneling it to himself through FRS and other entities he controls" and that "Burgess is planning on stealing every penny of PAIF's investor money;"

xxiv.  By email, dated January 3, 2018, West provided the contact information for Bernstein so that Bernstein could coordinate the delivery of documents to the SEC including the spreading of False Information regarding PAF's financial management of PAIF;

xxv.  By email, dated January 17, 2018, West advised the SEC that Bernstein was ready and waiting to cooperate with the SEC by sending the SEC documents from this litigation, in an effort to support the effort to achieve a Whistleblower Award and cause financial harm to MicroBilt, PAF, Burgess and Wojciechowski;

xxvi.  By email, dated February 2, 2018, West falsely accused Burgess and Wojciechowski to the SEC of "enrich[ing]" themselves "by charging Rosebud Lending (a tribal entity) fees for consulting services it provides on money PAIF lent to Rosebud RQC and possibly Arrowhead/TKC" (they did not);

xxvii.  By email, dated February 26, 2018, West forwarded to the SEC numerous discovery documents from this litigation that were marked as "AEO" (attorney's eyes only) that Bernstein improperly provided to Farrell and Szostak who then in turn forwarded them to West for delivery to the SEC, falsely alleging that those documents "proved" that PAF was hiding material losses (PAF was not);

xxviii.  By email, March 9, 2018, West spread more False Information to the SEC that "Burgess has used the last two years to move/steal all the funds to his accounts and now is screwing the LPs with these bankruptcies" (Burgess had not);

xxix.  By email, dated April 19, 2018, West sent False Information to the SEC including falsely alleging that Wojciechowski failed to pay fees owed to PAF and that Farrell and Szostak were terminated in order to hide the fraudulent non-payment;

xxx.  By email, dated April 27, 2018, West revealed to the SEC that he had spoken with Nanda who had disclosed Confidential Information to him that was then misunderstood and distorted as False Information that West then conveyed to the SEC's counsel;

52

xxxi.   By email, dated June 11, 2018, West sent an email to the SEC accusing Burgess and "company" (that is, Wojciechowski and MicroBilt) of causing the demise of Ranger;

xxxii.  By email, dated June 18, 2018, West revealed to the SEC that Nanda was in communications with Farrell and Szostak about Nanda's disclosure of Confidential Information with Burgess and Wojciechowski;

xxxiii. By email, dated August 3, 2018, West told the SEC that Burgess and Wojciechowski had failed to disclose documents that would have revealed their financial mismanagement;

xxxiv.  By email, dated September 22, 2018, West spread False Information to the SEC falsely accusing Burgess of controlling everything and further falsely accusing MicroBilt and Burgess of "tak[ing] all the money and hidden [sic] it so even if a receiver comes in, and despite the SEC's proof of claim, no one will get paid back … .";

xxxv.   By email, dated March 5, 2020, West sent False Information to the SEC's counsel falsely accusing MicroBilt, Burgess and Wojciechowski of fraudulently "siphon[ing]" their client's capital funds; and, without limitation,

xxxvi.  By text, dated July 3, 2021, Szostak disclosed to Farrell the strategy of taking Wojciechowski's deposition in this state litigation and then feeding those answers to the SEC in order to improve their chances of a Whistleblower Award.

### Bernstein's Participation In The False Scheme

219.   Bernstein, through the United States mail, emails and telephonic discussions, in coordination and agreement with Farrell and Szostak, and at all times on behalf of Farrell and Szostak and himself, and without limitation, through their agents and representatives (*i.e.*, the Third Party Counterclaim-Defendants), violated the New Jersey statutory and common law by without limitation, the following predicate incidents that formed, along with the other predicate incidents of the Third Party Counterclaim-Defendants, the agreement to participate in the Conspiracy and effectuate the False Scheme:

i.   In March 2016, Bernstein supported and agreed with Farrell's and Szostak's meeting and communicating with Ranger in an effort to

53

interfere and disrupt the relationship between PAF, MicroBilt and Ranger;

ii.    On or about December 2, 2016, Bernstein was also sanctioned in this case for filing a frivolous claim when he filed a claim under the New Jersey Minority Shareholder Oppression Act which was patently inapplicable because PAF is incorporated in Delaware;

iii.    In March 2017, as he was preparing legal pleadings, Bernstein, along with Farrell and Szostak, knowingly used Nanda as source of Confidential Information about Wojciechowski that was then twisted and distorted as False Information, even though Bernstein, Farrell and Szostak knew that Nanda held a confidential position of trust and thus held a fiduciary relationship with MicroBilt and PAF and that the Confidential Information that was provided to Bernstein violated Nanda's common law and statutory duties of non-disclosure as provided by the Nanda Agreements;

iv.    At this same time, in the Spring 2017, Bernstein, on behalf of Farrell and Szostak, reached out to Hacker, Ranger's General Counsel, offering his assistance to Ranger on behalf of Farrell and Szostak, and seeking the same from Ranger, all in an effort to spread False Information and disrupt and interfere with MicroBilt's and PAF's relationship with Ranger and thereby cause financial harm to MicroBilt and PAF;

v.    In December 2017, Bernstein had a conversation with West wherein Bernstein told West that Burgess was "raping PAF with bills," knowing that West would convey that same False Information to the SEC which West did by email, dated December 21, 2017;

vi.    In that December 21, 2017 email, Bernstein told West that he knew that the "Burgess raping" documents were produced under an "attorney's eyes only agreement" but nevertheless Bernstein disclosed the sum and substance of those restricted documents, distorted as False Information, to Farrell, Szostak and West with the intention that they would share that same "sum and substance" False Information with the SEC thereby causing an investigation;

vii.    By email, dated January 17, 2018, West advised the SEC that Bernstein was ready and waiting to cooperate with the SEC by sending the SEC documents from this litigation, in an effort to support the effort to achieve a Whistleblower Award;

viii.    By email, dated February 26, 2018, West forwarded to the SEC numerous discovery documents from this litigation that were marked as "AEO" (attorney's eyes only) that Bernstein improperly provided to Farrell and Szostak who then in turn forwarded them to West for delivery to the SEC, that continued to spread False Information that

54

falsely alleged that those documents "proved" that PAF was hiding material losses;

ix.  In June 2018, by email, Bernstein continued to provide False Information, through innuendo and recklessly inaccurate descriptions of financial information, to Ranger by communicating with Katsiff, all in an effort to assist Ranger in its litigation efforts against MicroBilt and PAF and thereby cause financial harm to MicroBilt and PAF;

x.  In September 2018, Bernstein spoke to and provided documents to the SEC which included the dissemination of False Information to the SEC, and Bernstein further specifically requested, and indicated a willingness "to share documentation and information for the mutual benefit of all" and made unproven allegations of False Information to the SEC that falsely suggested financial mismanagement by PAF, MicroBilt, Burgess and Wojciechowski;

xi.  At this same time, Bernstein, through Farrell and Szostak, had accessed MicroBilt's and PAF's Confidential Information by aiding and abetting the breach of fiduciary duty by not only (i) Farrell and Szostak, but also (ii) Nanda's fiduciary obligations pursuant to the Nanda Agreements;

xii.  As a result of his aiding and abetting these breaches of fiduciary duties, Bernstein used the improperly disclosed Confidential Information in his efforts to assist Ranger in their litigation against MicroBilt and PAF in order to further undermine and cause financial harm to MicroBilt and PAF;

xiii.  By text, dated February 11, 2019, Szostak revealed to Farrell that Bernstein had had a conversation with Ranger's counsel in the PAIF bankruptcy wherein Bernstein was attempting to peddle False Information in an order to undercut and instigate litigation against MicroBilt, PAF, Burgess and Wojciechowski in the PAIF bankruptcy;

xiv.  By email, dated March 27, 2019, Farrell disclosed to Ranger's counsel numerous documents that MicroBilt and PAF had produced in discovery in this litigation but that had been designated as AEO (attorneys' eyes only) and the only way that Farrell could have accessed and gained possession of such documents was if Bernstein disclosed them in violation of the Court's "attorneys' eyes only" discovery order;

xv.  Thereafter, both by telephonic conversation in April 2019, Bernstein continued to assist, on behalf of Farrell and Szostak, Ranger in its arbitration against PAF by providing False Information;

xvi.  In October 2019, Bernstein communicated with Ranger's bankruptcy counsel continuing to feed False Information in an effort to disrupt

Ranger's financial relationship with MicroBilt, PAF, Burgess and Wojciechowski;

xvii. By email, dated June 16, 2020, Szostak provided to Virginia Counsel the contact information for Bernstein so that Bernstein could speak (and upon information and belief did speak) directly with Virginia Counsel delivering False Information to Virginia Counsel in order to encourage Virginia Counsel to increase its litigation activities against MicroBilt, PAF, Burgess and Wojciechowski;

xviii. Upon information and belief, in June 2020, at the urging of Szostak, Bernstein spoke with Virginia Counsel and disclosed False Information to Virginia Counsel in an effort to create other expensive litigation processes by Virginia Counsel against MicroBilt, PAF, Burgess and Wojciechowski;

xix. In September 2020, when Farrell and Szostak learned that the Virginia Federal Judge had reopened the claims against Burgess, they credited their "attorneys" (*i.e.*, Bernstein) with having achieved that litigation victory when they texted each other: 2020-09-14 12:33:37 UTC <"+1 609-731-4513">: **Nothing like having ur lawyers be part of the judges hometown boys**. (emphasis supplied) (Bernstein was referenced by the phrase "ur lawyers" who Farrell and Szostak viewed as part of the "hometown boys" which is a reference to Virginia Counsel);

xx. In November 2020, Szostak was texting Farrell advising him that Bernstein would be sending an email "on what needs to be said in [their] brief;"

xxi. In June 2021, Bernstein was continuing to provide ghosting legal services to Farrell and Szostak without proper disclosure to the Court or opposing counsel;

xxii. In July and August 2021, after the dismissal in August 2020 of the affirmative claims asserted by Farrell and Szostak, Bernstein secretly continued to assist Farrel and Szostak in their litigation efforts in defense against the counterclaims of PAF, MicroBilt, Burgess and Wojciechowski;

xxiii. In fact, in August 2021, Szostak revealed in a text that Bernstein was providing them legal advice on how to proceed in this litigation involving the defense against the counterclaims;

xxiv. By text, dated March 7, 2022, Szostak revealed that they were still receiving secretive advice from Bernstein; and

xxv. Finally, upon information and belief, in the summer of 2017, Bernstein shared a list of PAF's investors with counsel for Shoreside and

represented, inaccurately, that PAF had an investor in California at the time the Shoreside Complaint was filed against PAF:

- This sharing of this Confidential Information and misrepresentation of the investor's state of residence was done by Bernstein for the sole purpose of getting Shoreside to increase the legal process (*i.e.*, the filing of a motion) against PAF;

- Shoreside relied on the Confidential Information that Bernstein provided and filed a motion for sanctions against PAF, claiming PAF intentionally misrepresented that the Central District of California had diversity jurisdiction to handle the Shoreside trial when the Court did not; and

- The Court ultimately denied Shoreside's motion, but PAF was forced to expend a substantial amount of attorneys' fees and litigation costs associated with defending against and defeating the sanctions motion that was premised on False Information that Bernstein knowingly promoted and disseminated.

### Baldo's Participation In The False Scheme

220. Baldo, through the United States mail, emails and telephonic discussions, in coordination and agreement with Farrell and Szostak, through their agents and representatives (*i.e.*, the Third Party Counterclaim-Defendants), violated the New Jersey statutory and common law by without limitation, the following predicate incidents that formed, along with the other predicate incidents of the Third Party Counterclaim-Defendants, the agreement to participate in the Conspiracy and effectuate the False Scheme:

i. Baldo was not only acting as a ghost attorney for Farrell and Szostak, but Baldo was also an owner in and an executive with Keycap Funding acting in a manner that Baldo knew was competitive with MicroBilt and PAF and in violation of, and in aiding and abetting of such violation, Farrell's and Szostak's fiduciary duties and Non-Disclosure Agreements;

ii. Specifically, as early as January 11, 2016, shortly after Farrell's and Szostak's termination, Baldo provided what Farrell, Szostak and Baldo described as "limited" legal services to Farrell and Szostak in their litigation against MicroBilt and PAF, even though the legal services was

often distorted by Farrell, Szostak and Baldo in order to permit Farrell and Szostak to continue to represent themselves as *pro se* and thereby gain a perceived advantage before the Court even though Baldo's ghost writing activities violated New Jersey ethics rules governing ghost writing by counsel;

iii. In his January 2016 communications, Baldo, acknowledging that there could be restrictions on Farrell's and Szostak's conduct due to their fiduciary and contractual duties, recommended that Farrell and Szostak review and consider whether they could "lawfully compete with PAF and solicit its clients and customers" and that Farrell and Szostak should "[e]xplore immediately whether [they] can compete with PAF and solicit it's clients, customers and investors;"

iv. As a result of these January 2016 discussions, Baldo was well aware of Farrell's and Szostak's contractual and fiduciary obligations to MicroBilt and PAF;

v. As an executive and owner of Keycap Funding, a competitor of MicroBilt and PAF, Baldo engaged upon a concerted effort to aid, abet and assist Farrell and Szostak in their concerted efforts to cause financial harm to MicroBilt and PAF by accessing and using Confidential Information and disseminating False Information;

vi. For example, by email, dated July 19, 2016, Baldo, an executive and owner with Keycap Funding, a competitor of MicroBilt and PAF, approached Nanda with an Agent Agreement whereby Nanda would execute an Agent Agreement, and did execute an Agent Agreement, with Keycap Funding while at the same time holding an insider confidential fiduciary position with MicroBilt, all of which was in knowing violation of the Nanda Agreements;

vii. As of March 5, 2017, Baldo was continuing to provide legal services in support of Farrell and Szostak, even though Baldo was hiding the extent of his involvement of providing controlling "ghosting" legal services while simultaneously disclaiming involvement in such legal services;

viii. In particular, in March 2017, Baldo assisted in ghostwriting a letter on behalf of Farrell and Szostak to MicroBilt's attorney demanding dismissal of the counterclaims asserted against Farrell and Szostak as well as providing a draft answer to those counterclaims with affirmative defenses;

ix. Also, in mid-May 2017, Baldo drafted detailed and professional discovery requests for Farrell and Szostak which failed to disclose Baldo's authorship and involvement, and as well prepared a case management order for Farrell and Szostak to submit to the Court, all done without proper disclosure to the Court;

58

x.  In June and July 2017, Baldo, along with Farrell and Szostak, openly an falsely denied to MicroBilt's and PAF's counsel that Baldo was Farrell's and Szostak's attorney regarding this litigation while simultaneously attempting to argue that Baldo had been hired and was permitted to provide limited legal services to Farrell and Szostak regarding the litigation but without entering his appearance or advising the Court;

xi.  And yet, during this same time frame, Baldo was (i) reviewing pleadings and other filings, including Orders of the Court, and (ii) providing Farrell and Szostak with his own legal understanding of the impact and effect of such Orders;

xii.  Upon information and belief, Baldo was providing ghostwriting legal services and failing in his duty of candor to the Court and to counsel for MicroBilt and PAF in order to receive a portion of the Whistleblower Award and in order to give Farrell and Szostak an advantage in this litigation as *pro se* litigants;

xiii.  During this same time, Baldo was writing letters (*e.g.*, June 25, 2017 Letter) to undersigned counsel for MicroBilt and PAF disclaiming his representation of Farrell and Szostak in this litigation and yet providing his own interpretation of the claims and legal positions being taken by Farrell and Szostak;

xiv.  In September 2017, Baldo submitted a legal invoice to Farrell and Szostak, and upon information and believe, has continued to provide throughout the intervening years "ghost" legal services in the same manner as he had before, except that Baldo is unlikely being paid except, upon information and belief, through an entitlement of a portion of any Whistleblower Award;

xv.  Baldo's involvement and continued ghost and secretive advice continued thereafter; for example, Farrell and Szostak spoke with and received legal advice from Baldo, without limitation, on at least these following dates: April 2019, July 2021 and then March 2022;

xvi.  Upon information and belief, Baldo has provided and continues to provide ghostwriting legal services and failing in his duty of candor to the Court and to counsel for MicroBilt and PAF in order to receive a portion of the Whistleblower award;

xvii.  Baldo knew that Farrell, Szostak and Nanda held fiduciary positions with MicroBilt and PAF that were controlled by non-disclosure agreements but nevertheless undermined and exploited those relationships for his own benefit and the benefit of Keycap Funding; and

59

xviii.   In March 2022, Farrell and Szostak were continuing to receive legal advice and assistance for their efforts from Baldo.

**Barrile's Participation In The False Scheme**

221.   Barrile, through the United States mail, emails and telephonic discussions, in coordination and agreement with Farrell and Szostak, through their agents and representatives (*i.e.*, the Third Party Counterclaim-Defendants), violated the New Jersey statutory and common law by without limitation, the following predicate incidents that formed, along with the other predicate incidents of the Third Party Counterclaim-Defendants, the agreement to participate in the Conspiracy and effectuate the False Scheme:

i.   Barrile, as a hired executive for Fund Recovery, an affiliate of MicroBilt, and with access to the Confidential Information of the MicroBilt and PAF, misappropriated and disclosed such Confidential Information to Farrell and Szostak and the SEC, and falsely disclosed in March 2017 information falsely suggesting financial mismanagement by MicroBilt, PAF, Burgess and Wojciechowski, including False Information about state licensure of PAF, PAIF and Fund Recovery;

ii.   From February 2017 through at least March 2022, Barrile, Farrell and Szostak exchanged by email and text through innumerable communications False Information about MicroBilt, PAF, Burgess and Wojciechowski that they intended to disseminate to the False Information Recipients, all in an effort to instigate other litigation efforts against MicroBilt, PAF, Burgess and Wojciechowski including the PAIF bankruptcy, the Ranger arbitration, the Argon bankruptcy and the SEC's investigation and complaint;

iii.   In February 2017, in communications with Farrell and Szostak, Barrile contacted Hacker, Ranger's General Counsel, to discuss disseminating Confidential Information with Ranger;

iv.   In March 2017, Barrile had conversations with Szostak regarding the whistleblowing efforts at the SEC wherein Barrile requested that Szostak relay to the SEC certain False Information regarding an issue regarding the state licensure held by Fund Recovery and PAIF wherein Barrile was falsely suggesting that PAIF was illegally collecting loan payments without proper licenses;

60

v.  By email, dated March 30, 2017, Szostak relayed the False Information from Barrile to the SEC;

vi.  In April 2017, Barrile started forwarding internal MicroBilt and PAF emails which was Confidential Information to the SEC in order to instigate the SEC to conduct an investigation of MicroBilt, PAF, Burgess and Wojciechowski, in the hope of achieving a whistleblower award;

vii.  Also, during this same conversation, Barrile spread additional False Information falsely alleging that PAF/PAIF were making certain financial reporting irregularities to Szostak, knowing that Farrell and Szostak would relay that False Information to the SEC;

viii.  Thereafter, on or about April 8, 2017, Barrile continued to exchange False Information with Szostak, this time by text to Szostak knowing that such False Information was going to be relayed to the SEC, wherein Barrile was providing False Information, including False Information about Fund Recovery and its use of Centrinex, a loan servicer, all in an effort by knowing and false reckless innuendo that Burgess and MicroBilt was stealing money (they were not);

ix.  Upon information and belief, in May 2017, Barrile was providing False Information to the SEC alleging financial mismanagement and failure to disclose regarding PAF's investment in an entity known as Wag's Lending as well as at this same time falsely telling the SEC that PAF misled Ranger (and providing to the SEC the contact information for Hacker, Ranger's General Counsel);

x.  On or about May 19, 2017, Barrile had another conversation with Szostak wherein Barrile was providing Confidential Information regarding Argon's loss reserve account and the fair market value of Argon's portfolios, all of which was Confidential Information that was being inaccurately misrepresented by Barrile as False Information who knew that such False Information would be relayed by Farrell, Szostak and West to the SEC;

xi.  On or about December 22, 2018, Barrile and Szostak were communicating about attempting to instigating new litigations and additional legal process in the Argon bankruptcy against MicroBilt and Burgess;

xii.  Upon information and belief, in March 2019, Barrile provided False Information to the SEC about false allegations that Burgess had stolen money from PAF (he had not);

xiii. Upon information and belief, in April 2019, Barrile provided additional False Information to the SEC wherein he falsely accused PAIF of being deceptive with its financial reporting (it was not);

xiv. Barrile's conversations with Szostak violated his New Jersey and common duties of non-disclosure of MicroBilt's and PAF's Confidential Information;

xv. Upon information and belief, in April and May 2019, Barrile was in constant communications with Szostak disseminating False Information about PAF, MicroBilt, Burgess and Wojciechowski, and sharing other information with each other about MicroBilt, PAF, Burgess and Wojciechowski;

xvi. On or about May 10, 2019, Barrile engaged in communications with Hacker, Ranger's General Counsel, whereby Barrile disclosed both False Information and Confidential Information to Ranger's bankruptcy counsel as well as the PAIF Bankruptcy Trustee, all in an effort to instigate additional legal process against MicroBilt, Burgess and Wojciechowski;

xvii. On this same date, May 10, 2019, Szostak told Barrile by text what False Information Barrile should be telling Ranger's bankruptcy counsel and the PAIF Bankruptcy Trustee, all in an effort to instigate additional legal process against MicroBilt, PAF, Burgess and Wojciechowski;

xviii. In that same email, Szostak advised Barrile to "use your judgement on what you think is important to tell Cantor [PAIF Bankruptcy Trustee], I'm sure he'll ask you how you know this, feel free to say me" to which Barrile agreed by responding "sure;"

xix. On that same date, Szostak asked Barrile for copies of those documents that Barrile had forwarded to the SEC, and Barrile further advised Szostak that he had spoken with Ranger's counsel and had spread certain False Information about the cost of phone calls and aging reports;

xx. Upon information and belief, in July 2019, Barrile received False Information from Farrell and Szostak and then relaying that False Information to Hacker, Ranger's General Counsel, and/or Jim Lawlor, counsel to the PAIF Bankruptcy Trustee, in an effort to spread False Information about PAF, MicroBilt, Burgess and others;

xxi. Upon information and belief, during that same time, Szostak was continuing to send False Information to Barrile asking him for confirmation based upon his knowledge of MicroBilt's and PAF's Confidential Information;

xxii. Upon information and belief, Barrile received information from Szostak regarding information that Nanda had told Szostak and that Barrile had relayed to Jim Lawlor, counsel to the PAIF Bankruptcy Trustee, about allegations of mismanagement at MicroBilt and PAF regarding "static pool analysis;"

xxiii. Upon information and belief, in August and September 2019, Barrile was in repeated communications with Szostak regarding the efforts to press the SEC's investigation against MicroBilt, PAF, Burgess and Wojciechowski, using False Information;

xxiv. Upon information and belief, in September 2019, Barrile disseminated False Information with the SEC about MicroBilt, PAF, PAIF, Amber Miller and information that was shared and discussed at a MicroBilt Board meeting;

xxv. In or around October 8, 2019, Barrile advised Szostak that he had spoken to an attorney (Mr. Lawlor) representing the PAIF Bankruptcy Trustee and that Barrile had provided litigation tips to that attorney about Confidential Information that Barrile could have only known from his position working on behalf of MicroBilt;

xxvi. Upon information and belief, in November 2019, Szostak was in communication with Barrile disseminating False Information about the PAIF bankruptcy and Ranger arbitration;

xxvii. Upon information and belief, in November 2019, Barrile was forwarding information (in the form of a letter from the PAIF bankruptcy judge) to the SEC that he had received from Szostak regarding the PAIF bankruptcy;

xxviii. In December 2019, upon information and belief, Barrile, who traveled to New Jersey on other business, was also scheduled to meet with Szostak and possibly Farrell at or near a Basking Ridge New Jersey hotel to discuss their efforts to cause financial harm to MicroBilt and PAF by disseminating False Information; and, without limitation,

xxix. Upon information and belief, in March 2020, Barrile communicated with the SEC wherein he spread False Information and accused PAF, MicroBilt, Burgess and Wojciechowski of defrauding PAF's investors (they had not).[6]

**Nanda's Participation In The False Scheme**

---

[6] When it was learned that Barrile had participated in the joint efforts at pursuing and filing whistleblower claims to the SEC, Burgess attempted to speak with Barrile. Although Burgess initially spoke with Barrile, Barrile made additional promises to speak with Burgess at greater length, but it was learned through discovery, that Barrile had no intention of speaking with Burgess again and actively misrepresented his willingness to speak further.

222. Nanda, through the United States mail, emails and telephonic discussions, in coordination and agreement with Farrell and Szostak, through their agents and representatives (*i.e.*, the Third Party Counterclaim-Defendants), violated the New Jersey statutory and common law by without limitation, the following predicate incidents that formed, along with the other predicate incidents of the Third Party Counterclaim-Defendants, the agreement to participate in the Conspiracy and effectuate the False Scheme:

    i.    As an inside consultant and fiduciary to MicroBilt and PAF (as MicroBilt's affiliate), who was subject to the multiple confidentiality agreements and non-disclosure provisions of the Nanda Agreements, Nanda nevertheless colluded with Farrell and Szostak to steal MicroBilt's and PAF's Confidential Information and share such Confidential Information with Farrell and Szostak so as to attempt to financially ruin PAF, MicroBilt, Burgess and Wojciechowski.

    ii.    By email, dated July 19, 2016, Baldo, an executive and owner with Keycap Funding, a competitor of MicroBilt and PAF, provided Nanda with an agent agreement whereby Nanda would execute an Agent Agreement, and did execute an Agent Agreement, with Keycap Funding while at the same time holding an insider fiduciary confidential role with MicroBilt;

    iii.    By executing the Agent Agreement, Nanda not only violated the provisions of the Nanda Agreements, but he further aided and abetted the breach of Farrell's and Szostak's fiduciary duties;

    iv.    In March 2017, Nanda, at the urging of Bernstein, Farrell and Szostak, disclosed Confidential Information about MicroBilt, PAF and Wojciechowski in violation of Nanda's fiduciary relationship with MicroBilt and PAF and in knowing violation of the Nanda Agreements;

    v.    By email, dated April 27, 2018, West disclosed that he had many conversations with Nanda wherein Nanda made disclosures of Confidential Information and further made false accusations regarding MicroBilt and PAF, even going so far as providing the SEC with Nanda's telephone number;

    vi.    Upon information and belief, Nanda had conversations with the SEC wherein he conveyed False Information and Confidential Information to the SEC;

vii.   By email, dated June 18, 20108, West revealed that Nanda was in communications with Farrell and Szostak about Nanda's confidential communications with Burgess and Wojciechowski;

viii.   Upon information and belief, in or around July 2019, in violation of the Nanda Agreements, Nanda was providing Confidential Information to Szostak about MicroBilt, Wojciechowski and alleged issues relating to PAF's static pool analysis; and, without limitation,

ix.   On numerous occasions, Nanda, by texts, emails and/or telephonically, was communicating with Farrell and Szostak providing MicroBilt's Confidential Information about MicroBilt's internal business processes; including without limitation, on the following dates regarding the following subjects and discussions:

- On or about January 14, 2019, Nanda met with Szostak to disclose Confidential Information with him regarding conversations that Nanda had with Wojciechowski;

- On or about January 15, 2019, Farrell and Szostak were communicating between themselves as to how to "protect" Nanda if there are investigations of MicroBilt, knowing that Nanda had provided them with Confidential Information in violation of Nanda's fiduciary duties;

- On or about August 15, 2019, Nanda disclosed to Szostak and Farrell Confidential Information in the nature of highly sensitive internal MicroBilt Board meeting discussions to Szostak, including confidential internal considerations of settlement positions regarding the PAIF bankruptcy;

- On or about August 27, 2019, Nanda disclosed to Szostak and Farrell highly sensitive Confidential Information regarding MicroBilt's email systems, cybersecurity concerns and draw requests;

- On or about September 19, 2019, Nanda disclosed to Szostak and Farrell Confidential Information pertaining to the internal circumstances and business operations at MicroBilt;

- On or about November 20, 2019, Nanda continued to disclose to Szostak and Farrell Confidential

Information pertaining to the internal circumstances at MicroBilt; and

- On or about December 21, 2019, Nanda continued to disclose to Szostak and Farrell Confidential Information pertaining to the internal circumstances at MicroBilt.

**Copley's And Sarah's Participation In The False Scheme**

223.    Copley and Sarah, through the United States mail, emails and telephonic discussions, in coordination and agreement with Farrell and Szostak, violated New Jersey common law by, without limitation, the following predicate incidents that formed, along with the other predicate incidents of the Third Party Counterclaim-Defendants, the agreement to participate in the Conspiracy and effectuate the False Scheme:

**Sarah's Embedded Role In PAF's Operations From 2015**

224.    Beginning in or about January 2015, Sarah managed PAF's public-facing social-media accounts, including its Twitter, LinkedIn, Facebook and other accounts, and transmitted the associated account login credentials to Szostak. [SC-000000018; SC-000000021].

225.    Sarah also received blind-copied MicroBilt and PAF business correspondence during this same period. [SC-000000020].

226.    As alleged *supra*, Szostak utilized his daughter, a college student, to prepare PAF's investor decks and marketing materials.

**Sarah's March 31, 2016 Transmission Of
The Litigation Materials To The Financial Press**

227.    On March 31, 2016, using the email account sarahcopley17@gmail.com and signing the communication in her own name, Sarah transmitted the First Amended Verified Complaint in this action to Jasmin Leitner, a reporter at Pageant Media, directing the reporter to "focus on page 20 beginning with the merger, that is a big issue in this case," and stating that "Bert is available for questions."

228. The reporter confirmed receipt. [SC-000005708; SC-000005710].

229. The First Amended Verified Complaint transmitted by Sarah on March 31, 2016, was a pleading containing the Confidential Information that Defendants had moved to seal by their February 17, 2016 Motion to Seal, that was the subject of oral argument on March 18, 2016, and that the Court ordered sealed and redacted by its April 15, 2016 Order.

230. Sarah transmitted that pleading knowing that its confidential character was then the subject of a pending application before this Court.

**The April 4, 2016 Coordinated Media Campaign**

231. On April 4, 2016, the email account sarahcopley17@gmail.com transmitted the same First Amended Verified Complaint to (i) Ryan Weeks, Editor of AltFi [SC-000005711], (ii) Sean Murray of debanked.com [SC-000005789], and (iii) Peter Rudegeair of The Wall Street Journal [SC-000005867], each of whom confirmed receipt. [SC-000005951; SC-000005945; SC-000005950].

232. That same day, in a follow-up to the Pageant Media reporter, the sarahcopley17@gmail.com account supplied the contact information for Gary Melara, specifically identifying him as 'the portfolio manager for the Ranger direct lending fund,' and providing his direct email address. [SC-000005948].

233. The identification of Melara by institutional role and fund name, rather than by personal name alone, demonstrates that the author of that transmission understood Ranger's identity, Ranger's structural relationship to PAIF as its principal investor, and the mechanism by which routing the litigation narrative to Ranger's portfolio manager would inflict maximum financial damage on MicroBilt and PAF.

234. The routing of the litigation narrative to Ranger's portfolio manager was the single most direct available method of converting press coverage into investor-level economic harm.

235.    Sara's April 4, 2016 follow-up reply to the same Pageant Media reporter, in which she committed to provide the contact information for Gary Melara, Ranger's portfolio manager, was signed 'Bert.' [SC-000005709].

236.    Sarah's April 4, 2016 email to AltFi was likewise signed 'Bert.' [SC-000005711].

237.    The AltFi editor addressed his confirmation reply directly to 'Sarah,' [SC-000005951], confirming the account's ownership notwithstanding the signature.

238.    Sarah was not passively forwarding materials; rather, Sarah was actively managing the media relationships, directing editorial attention to specific content, and deliberately routing the litigation narrative toward MicroBilt's and PAF's most financially consequential investor relationship, alternating identities to serve the purposes of the moment.

239.    The three emails to AltFi, debanked.com, and The Wall Street Journal were transmitted within a three-minute window, between 12:06 and 12:09 PM EDT on April 4, 2016, each containing identical body text and signed 'Bert.' [SC-000005711; SC-000005789; SC-000005867].

240.    The simultaneous, multi-outlet, templated nature of these transmissions, executed within three minutes and directed to separately selected financial press contacts, demonstrates not a spontaneous act but a planned and coordinated media operation designed to achieve maximum press penetration of the sealed litigation materials across the financial marketplace.

241.    To the extent any of the April 4, 2016 transmissions were authored by Szostak utilizing Sarah's account with her knowledge and permission, Sarah's knowing maintenance of and provision of access to that account for that purpose is independently actionable.

242.    Sarah knowingly made available the instrument of the transmissions with full knowledge of their content and purpose, and her deliberate facilitation of the dissemination of

sealed litigation materials through her account constitutes willful and malicious conduct in its own right.

## Receipt Of Litigation Strategy By Both Copley And Sarah

243.    On March 22, 2017, at 8:22 a.m., Szostak forwarded to both Copley, at copley@presentcompanyonline.com, and Sarah, at sarahcopley17@gmail.com, the complete attorney-client correspondence between Bernstein, Farrell, and Szostak dated March 22, 2017, including as an attachment the detailed eight-page litigation strategy letter prepared by Bernstein on that same date, which addressed expert witness strategy, merger squeeze-out theory, the viability of claims against Wojciechowski, and the overall litigation posture of the campaign against MicroBilt, PAF, Burgess, and Wojciechowski. [Szostak-000061157; Szostak-000061171].

244.    The forwarded chain further included the underlying email from Farrell to Bernstein demanding that Wojciechowski be added to the complaint as a co-conspirator and discussing other litigation strategy in detail. [Szostak-000061158].

245.    Copley and Sarah thereby received actual attorney work product, not merely general awareness of the litigation, that set forth with specificity the legal theories, strategic objectives and target defendants of the False Scheme at the time they continued to participate in furtherance of it.

## Copley's Transmission Of Litigation Materials To The Hedge Fund Reporter

246.    On March 5, 2016, using the email address copleys58@gmail.com, Copley transmitted litigation materials concerning PAF, PAIF and MicroBilt, including a Brief in Opposition and supporting certifications, to James Prado Roberts, the Hedge Fund Reporter. [CS-000000917].

247.    As the New Discovery further reveals, Szostak was in continuing contact with the Hedge Fund Reporter over multiple years as part of the False Scheme, and Copley's March 2016

transmission was one component of that sustained campaign to cause financial harm to MicroBilt and PAF through the financial press.

248. James Prado Roberts, the recipient of Copley's March 5, 2016 transmission [CS-000000917], was not a randomly selected financial journalist.

249. Roberts was a personal acquaintance of Szostak, a college-era contact whom Szostak had cultivated as a media asset, and who had written favorably about PAF and PAIF during Szostak's tenure and unfavorably following Szostak's termination.

250. Copley, as Szostak's spouse and active participant in his post-termination activities, was aware of Roberts's identity, his established relationship with Szostak and his function as a vehicle for press-driven financial damage to MicroBilt and PAF.

251. Copley's selection of Roberts as the recipient of sealed litigation materials was not accidental, it was purposeful, made with knowledge of the role Roberts had already assumed in the False Scheme. Copley's transmission on March 5, 2016, contained no explanatory body text beyond the single word 'fyi.' [CS-000000917].

252. The absence of any explanation, instruction, or context demonstrates that Copley and Roberts shared a pre-existing understanding of the purpose of the transmission.

253. Copley wrote only 'fyi' because both she and Roberts already understood what the materials were for and what Roberts was expected to do with them.

254. Copley and Sarah remained engaged in the financial affairs and operations through which the False Scheme was conducted, including the Lead Hero and Present Company business ventures through which Szostak operated after his termination from PAF. [Szostak-000215009; Szostak-000188615].

255. The New Discovery reveals that Sarah held a one-third equal partnership interest in Lead Hero LLC, with Szostak controlling the operations of the business through Sarah's

70

accounts and financial instruments, including her PNC business account and PayPal accounts. [Szostak-000229133].

256. Bob Farrell, the Plaintiff/Counterclaim-Defendant in this action, was a paying client of Lead Hero LLC during this period. [Szostak-000229133].

257. Pat Nanda, a Third Party Counterclaim-Defendant, was likewise a paying Lead Hero client, with Sarah personally managing his billing account as recently as April 2022. [Szostak-000188615].

258. The financial relationships binding the members of the Conspiracy together, through Lead Hero, persisted throughout the pendency of this litigation and continued to tie Sarah to the financial interests of Farrell, Szostak and Nanda.

### Sarah's Ongoing And Active Participation In The False Scheme Through 2021

259. The New Discovery further reveals that Sarah's participation in the False Scheme was not limited to the March and April 2016 press transmissions.

260. Sarah continued to actively assist Szostak in the False Scheme through the pendency of this litigation.

261. On multiple occasions in 2021, Sarah assisted Szostak directly with litigation tasks in this proceeding, including preparing litigation documents, working on case answers, creating exhibits for Szostak's motions, and independently researching PAF's website history for use as litigation evidence. [Szostak-000192765; Szostak-000192766; Szostak-000192776; Szostak-000192793; Szostak-000192822].

262. On June 26, 2021, when the SEC filed its complaint against MicroBilt, PAF, Burgess and Wojciechowski, Sarah and Szostak exchanged text messages in which Sarah read the SEC complaint in real time, identified Szostak's pseudonym within it, texting 'I got that one haha' in reference to his designation as 'Managing Director B', and responded to the SEC filing with the

71

phrase 'MY MONEY,' a direct reference to the whistleblower award proceeds that Szostak and Farrell had been pursuing since 2016. [Szostak-000192777].

263. Sarah further predicted legal consequences for Wojciechowski: 'Walt is going to have to cut a deal with the SEC two maybe two years if he turns on Phil' and characterized him as someone who would cooperate under pressure.

264. Sarah's June 2021 conduct demonstrates that she understood the financial mechanics of the False Scheme, tracked its litigation consequences in real time, and considered herself a participant in its financial proceeds.

265. These acts confirm that Sarah's participation in the False Scheme was knowing, ongoing, and active, not a single isolated act of document transmission in 2016.

**Sarah's Coordination Of Her Subpoena Response With Baldo**

266. When Sarah was subpoenaed for production of documents in this litigation, she sought and received legal advice from Baldo, a named Third Party Counterclaim-Defendant alleged to have provided ghost legal services in furtherance of the False Scheme, regarding the scope of her production obligations. [SC-000005313].

267. In her communications with Baldo, Sarah sought to narrow her production to documents that 'explicitly' named her parents, stating her 'impression' that she would 'only be providing communication (emails) that include the keywords with these parties.' [SC-000005313].

268. Baldo's simultaneous role as a defendant whose documents could be implicated by Sarah's production, and as her *de facto* legal advisor on subpoena scope, constitutes a conflict of interest and reflects the coordinated effort of the Conspiracy's members to limit the discovery available to MicroBilt and PAF.

269.  Sarah's production-limiting strategy, developed in coordination with a co-defendant, is further evidence of her knowing participation in the False Scheme and her awareness of the significance of the communications sought.

### Copley's Willful And Malicious Conduct
### And The Direct Economic Injury She Caused

270.  At the time Copley transmitted the litigation materials to the Hedge Fund Reporter on March 5, 2016 [CS-000000917], Defendants' February 17, 2016 Motion to Seal Confidential Commercial and Financial Information was pending before this Court, oral argument on that Motion had been scheduled and was imminent (and in fact occurred on March 18, 2016), and the confidential character of the materials Copley transmitted was expressly the subject of that pending application.

271.  Copley transmitted those materials with actual knowledge that their confidentiality was then being actively adjudicated by this Court.

272.  Copley undertook the transmission described above deliberately and intentionally.

273.  Copley acted not merely with the intent to perform the act of transmission, but with the specific subjective intent to cause economic injury to MicroBilt and PAF.

274.  Copley understood, at the time of her transmission, that dissemination of the Confidential Information and sealed litigation materials to the financial press, and the routing of the litigation narrative to MicroBilt's and PAF's investors and the financial markets, was substantially certain to cause, and was intended by her to cause, direct financial harm to MicroBilt and PAF, including injury to their investor relationships, customer relationships, and professional reputations.

275.  Copley's selection of the Hedge Fund Reporter, a nationally recognized financial press outlet whose readership consists primarily of hedge fund professionals, including the class

of investors upon whom PAF and PAIF depended for investment capital, as the recipient of sealed litigation materials was deliberate. [CS-000000917].

276. James Prado Roberts, the specific Hedge Fund Reporter recipient, was not a stranger but a known media contact whom Copley understood had an established relationship with Szostak and had previously written coverage concerning PAF.

277. Copley was, through her years of involvement in PAF's business and operations alongside Szostak, aware that PAIF's investor relationships were with hedge fund and institutional capital, and that the Hedge Fund Reporter's readership consisted of the precise class of financial professionals upon whom PAF and PAIF depended.

278. Copley knew, at the time of her transmission, that placing sealed litigation materials before that audience was substantially certain to cause injury to PAF's and PAIF's investor relationships.

279. The economic injury that resulted was not a collateral or unforeseeable consequence of Copley's act, it was its purpose and its substantially certain result.

280. Copley's transmission contained no body text beyond the word 'fyi,' [CS-000000917], demonstrating that she and Roberts shared a pre-existing understanding of the purpose of the materials, Copley required no explanation because the scheme was already understood.

281. Copley's conduct was malicious in that it was wrongful, undertaken without just cause or excuse, and in conscious and deliberate disregard of the duties owed to, and the rights of, MicroBilt and PAF.

282. Copley acted with full awareness that her conduct had no legitimate purpose and that its intended and foreseeable consequence was the infliction of economic injury upon MicroBilt and PAF.

283. Copley's willful and malicious conduct was undertaken in her individual capacity, and not as an agent, employee, or representative of Szostak or any other party.

284. Copley exercised independent judgment in selecting the recipient of the transmission, in identifying and transmitting the specific materials, and in directing the narrative to the financial press, and she did so for the purpose of furthering her own participation in the False Scheme and causing financial harm to MicroBilt and PAF.

285. Upon information and belief, Copley independently identified and selected the Hedge Fund Reporter as a recipient of the sealed litigation materials, exercising her own judgment as to the timing, recipient, and content of the transmission, and did so without being directed by Szostak to transmit those specific materials to that specific recipient at that specific time.

286. As a direct and proximate result of Copley's willful and malicious conduct, MicroBilt and PAF sustained actual economic injury, including injury to their investor and customer relationships and to their professional reputations in the financial marketplace, in an amount to be proven at trial.

### Sarah's Willful And Malicious Conduct
### And The Direct Economic Injury She Caused

287. Sarah transmitted the sealed First Amended Verified Complaint to members of the financial press on March 31, 2016 [SC-000005708; SC-000005710], and April 4, 2016 [SC-000005711; SC-000005789; SC-000005867], with actual knowledge that the confidential character of that pleading was then the subject of Defendants' pending Motion to Seal, and that this Court had heard oral argument on that Motion on March 18, 2016, thirteen days before Sarah's first transmission.

288. The April 4, 2016 campaign was executed with operational precision.

289. Within a three-minute window, between 12:06 and 12:09 PM EDT, identical emails transmitting the sealed First Amended Verified Complaint were sent

from sarahcopley17@gmail.com to three separate national financial press outlets: (i) AltFi [SC-000005711 — 12:06:59 PM], (ii) debanked.com [SC-000005789 — 12:08:15 PM], and (iii) The Wall Street Journal [SC-000005867 — 12:09:12 PM].

290.    Each email bore identical body text and was signed 'Bert.'

291.    The simultaneous, multi-outlet, templated nature of these transmissions, sent within three (3) minutes to three separately selected financial press contacts, demonstrates not a spontaneous act but a planned and coordinated media operation, designed to achieve maximum press penetration of the sealed litigation materials across the financial marketplace.

292.    Sarah acted not merely with the intent to perform the act of transmission, but with the specific subjective intent to cause economic injury to MicroBilt and PAF.

293.    Sarah's direction to the Pageant Media reporter to "focus on page 20 beginning with the merger, that is a big issue in this case" [SC-000005708], and her supply, in a follow-up communication signed 'Bert,' of contact information for Gary Melara, whom she identified specifically as 'the portfolio manager for the Ranger direct lending fund' [SC-000005948], for the explicit purpose of routing the litigation narrative to the investor relationship most capable of inflicting financial harm to MicroBilt and PAF.

294.    Sarah did not merely provide a name, she identified the contact by institutional role, named the fund by its formal designation, and supplied the direct email address.

295.    A person who routes sealed litigation materials to a hedge fund reporter and then separately ensures that the reporter can directly contact the portfolio manager of the target entity's largest investor, while identifying that investor's role with institutional specificity, has not acted carelessly or recklessly.

296.    Sarah has acted with knowledge that economic injury to that investor relationship was the purpose of her conduct and its substantially certain result.

297. Sarah's conduct was malicious in that it was wrongful, undertaken without just cause or excuse, and in conscious and deliberate disregard of the duties owed to, and the rights of, MicroBilt and PAF.

298. Sarah acted with full awareness that her conduct had no legitimate purpose and that its intended and foreseeable consequence was the infliction of economic injury upon MicroBilt and PAF.

299. To the extent the April 4, 2016 transmissions were authored and sent by Szostak utilizing Sarah's email account, Sarah's knowing maintenance of and provision of access to her account sarahcopley17@gmail.com for that purpose is independently actionable: Sarah knowingly made available the instrument of the transmissions with full knowledge of their content and purpose, and her deliberate facilitation of the dissemination of sealed litigation materials through her account constitutes willful and malicious conduct in its own right, independent of who physically typed and sent the emails.

300. Sarah's willful and malicious conduct was undertaken in her individual capacity, and not as an agent, employee, or representative of Szostak or any other party.

301. Sarah exercised independent judgment in managing and transmitting from her own email account, in directing reporters to specific content, and in routing contact information to Ranger's portfolio manager, and she did so for the purpose of furthering her own participation in the False Scheme and causing financial harm to MicroBilt and PAF.

302. Sarah's awareness of and investment in the financial objectives of the False Scheme extended well beyond the 2016 press transmissions.

303. On June 26, 2021, upon learning that the SEC had filed its complaint against MicroBilt, PAF, Burgess, and Wojciechowski, Sarah texted Szostak 'MY MONEY', a direct

reference to the whistleblower award proceeds Szostak and Farrell had been pursuing since January 2016. [Szostak-000192777].

304. Sarah's response to the SEC filing was not surprise or curiosity, it was a claim of financial entitlement to the proceeds of the scheme's success.

305. This statement, made five years after the initial 2016 press transmissions, confirms that Sarah's participation in the False Scheme was not an isolated act of document forwarding but a sustained and knowing investment in a scheme designed to produce financial harm to MicroBilt and PAF and financial benefit to Sarah herself.

306. Under the standard established by *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), a debtor who acts knowing that harm to another is substantially certain to result, and who expects financial benefit from that harm, has acted willfully within the meaning of 11 U.S.C. § 523(a)(6). Sarah's own words confirm both elements.

307. As a direct and proximate result of Sarah's willful and malicious conduct, MicroBilt and PAF sustained actual economic injury, including injury to their investor and customer relationships and to their professional reputations in the financial marketplace, in an amount to be proven at trial.

**False Scheme Caused
Damages To Counterclaim Plaintiffs**

308. As detailed more fully above, the False Scheme harmed Counterclaim Plaintiffs by directly and proximately causing Counterclaim Plaintiffs to lose business opportunities, to have their professional reputations held in disrepute and associated with quasi-criminal behavior, and otherwise become mired in unnecessary, frivolous and factually inaccurate regulatory investigations and complaint, as well as other private legal process including, without limitation, Ranger's acrimonious arbitration, the Argon Credit Bankruptcy, the PAIF Bankruptcy and the

78

Virginia Litigations, all of which has caused significant damages to Counterclaim Plaintiffs in the nature of legal fees and costs.

### Burgess And Wojciechowski Are
### Additional Victims Of False Scheme

309.    The False Scheme has caused--and continues to cause—Burgess and Wojciechowski substantial injury to their business, property and professional reputation.

310.    Consistent with the False Scheme as outlined, All Defendants colluded in the execution of the False Scheme to manipulate other persons, including the SEC's counsel, the Argon Credit Trustee, the PAIF Bankruptcy Trustee and Virginia Counsel, into believing the veracity of the False Allegations thereby causing such persons to instigate, promote and initiate costly and time consuming legal processes against Counterclaim Plaintiffs as well as Burgess and Wojciechowski.

311.    For example, Burgess and Wojciechowski have been damaged by having to defend against the federal Virginia litigations and the false Class Action Complaint filed by Virginia Counsel as well as against the SEC Complaint.

312.    The False Scheme also has prolonged and complicated this litigation, causing Counterclaim Plaintiffs, as well as Burgess and Wojciechowski, to fight for years at significant litigation cost and expense to uncover the truth and protect against the unauthorized disclosure of the Confidential Information and defend themselves against the effects of the dissemination of False Information.

## FOURTH AMENDED COUNTERCLAIMS

### COUNT I

### TORTIOUS INTERFERENCE WITH CONTRACT
### AND PROSPECTIVE ECONOMIC ADVANTAGE

### (MicroBilt and PAF v. Farrell, Szostak,
### Nanda, CBD, DVS, Barrile, Copley, Sarah and JOHN DOE)

313.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

314.     The identity of PAF's customers, PAF's business relationships with its customers, PAF's business plan and PAF's processes and procedures, as well as other similar proprietary non-public information regarding MicroBilt, are confidential and constitute trade secrets of MicroBilt and PAF (as described, *supra*, as the Confidential Information).

315.     Farrell, Szostak, Nanda and Barrile were provided with access to the Confidential Information in their capacities as Managing Members of, and equity holders in, PAF, or as paid consultants and contractors acting in high-level executive insider capacities with MicroBilt and/or PAF (or its related affiliates) with access to such Confidential Information, and were each contractually and/or through common law required to preserve the confidentiality of this Confidential Information for MicroBilt and PAF.

316.     During their employment and relationship with MicroBilt and/or PAF, however, Farrell, Szostak, Nanda and Barrile failed to preserve the confidentiality of the Confidential Information of both MicroBilt and/or PAF.

317.     Among other things, and in addition to the allegations made against each of Farrell, Szostak, Nanda and Barrile *supra*, Successor PAF discovered that Szostak emailed to his home email account Confidential Information, including customer and investor prospect lists and leads that were developed by PAF.

318.     Moreover, the allegations set forth herein further demonstrate that Farrell, Szostak, Nanda and Barrile have both (i) misappropriated the Confidential Information and (ii) disseminated False Information in their efforts to enrich themselves and cause financial harm to Microbilt and PAF and their respective prospective contractual relations.

319. Farrell's, Szostak's, Nanda's and Barrile's misappropriation of the Confidential Information of both MicroBilt and/or PAF and dissemination of the False information was occurring at the same time they were serving as Managing Members of PAF, and/or as consultants and/or contractors to, MicroBilt and/or their affiliated entities, and/or were otherwise bound by their fiduciary and/or contractual duties of non-disclosure.

320. Farrell's and Szostak's misappropriation was also occurring at the same time Farrell was threatening other equity holders in PAF with "burn[ing] the house down" if PAF did not comply with his demands.

321. Following their terminations, as noted, *supra*, Farrell and Szostak joined Keycap Funding which competes or competed with PAF for investors and borrowers.

322. Upon information and belief, Farrell, Szostak, Nanda and Barrile used, have been using and/or continue to use the Confidential Information, including, without limitation, customer and investor leads and lists, and other insider Confidential Information, that they obtained as former Managing Members, employees, consultants, contractors and/or equity holders of MicroBilt and/or PAF, in order to improperly solicit customers and investors away from PAF, and as well as to distribute such Confidential Information and disseminate False Information in effort to cause financial damage to PAF, MicroBilt, Burgess and Wojciechowski, all for their own benefit and financial gain.

323. Farrell, Szostak, Nanda and Barrile used and/or are using MicroBilt's and PAF's Confidential Information to contact PAF leads, investors and customers, as well as disseminate False Information to other third parties, all in an effort to destroy the professional reputation of MicroBilt and PAF to these leads, investors and customers, and tortiously interfering with MicroBilt's and Successor PAF's contracts and/or prospective economic advantage with these entities.

324. Farrell's, Szostak's Nanda's and Barrile's purpose, direct or indirect, in misappropriating MicroBilt's and PAF's Confidential Information and disseminating False Information was and is to (i) enrich themselves, Keycap Funding and their other individual and business ventures, and (ii) economically injure MicroBilt and PAF.

325. Farrell's, Szostak's, Nanda's and Barrile's conduct has been willful and outrageous, and was undertaken with malicious and reckless indifference to MicroBilt's and PAF's rights.

326. Farrell's, Szostak's, Nanda's and Barrile's actions to contact and solicit PAF's leads, investors and customers, and to destroy the reputation of MicroBilt and PAF through the dissemination of their respective Confidential Information, was intentional, malicious and without justification.

327. Copley and Sarah, with knowledge of MicroBilt's and PAF's economic relationships with their investors, including Ranger, PAIF's principal investor, intentionally transmitted the False Information and the sealed litigation materials to members of the financial press, and routed those materials to a contact for Ranger's portfolio manager, without justification and with malice, in order to interfere with and damage those economic relationships and MicroBilt's and PAF's prospective economic advantage.

328. Sarah's direction to the Pageant Media reporter to 'focus on page 20 beginning with the merger, that is a big issue in this case' [SC-000005708], is not the conduct of a passive conduit.

329. Rather, it is the conduct of a person who understood the litigation's content, understood its potential for economic harm to PAF's investor relationships, and deliberately guided a financial journalist toward the most damaging material.

330. Sarah's subsequent identification of Gary Melara as 'the portfolio manager for the Ranger direct lending fund' [SC-000005948], and provision of his direct contact information to

that same journalist demonstrates that Sarah understood which specific investor relationship was the target of maximum financial harm and took deliberate steps to ensure the litigation narrative reached it.

331.   The conduct of Copley and Sarah alleged in this Count I was undertaken in their respective individual capacities, and not merely as agents, employees, family members, or representatives of Szostak or any other party.

332.   Each of Copley and Sarah acted with her own independent knowledge of the False Scheme, her own specific subjective intent to cause economic injury to MicroBilt and PAF, and her own willful and malicious purpose in furtherance thereof.

333.   As a result of Farrell's, Szostak's, Nanda's and Barrile's actions, MicroBilt and Successor PAF have suffered and continues to suffer damages in the manner of lost economic advantages and opportunities.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation, respectfully requests that the Court enter judgment in their favor and against Robert Farrell, Robert Szostak, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., Dynamic Vertical Solutions, Inc., Copley Szostak and Sarah Copley Szostak, on Count I of the Fourth Amended Counterclaim as follows and award MicroBilt and PAF the following:

      a.   its actual and compensatory damages as applicable, to be proven at trial;

      b.   incidental, consequential and punitive damages as permitted by law;

      c.   pre-judgment and post-judgment interest as applicable;

      d.   its attorneys' fees and costs; and

      e.   such other relief as the Court deems equitable and just under the circumstances.

## COUNT II

## BREACH OF DUTY OF LOYALTY

### (MicroBilt and PAF v. Farrell And Szostak)

334. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

335. As Managing Members of PAF, Farrell and Szostak had a fiduciary duty of loyalty and care to act in good faith and in the best interest of PAF, and PAF's affiliate, MicroBilt, and the other members and to use the amount of care that a reasonably prudent person would exercise in similar circumstances in fulfilling their responsibilities.

336. Farrell breached his fiduciary duties of care and loyalty by being grossly negligent in fulfilling his responsibilities and by intentionally engaging in a campaign to burn PAF to the ground for failing and refusing to succumb to his demands and to spite other managing members and equity holders of PAF.

337. As set forth above, Farrell failed to fulfill the most basic responsibilities of his position as President and Managing Member of PAF by failing to ensure cash advances that PAF made to originators were used to fund consumer loans and these loans, complied with PAF's definition of eligible receivables, and failing to confirm there was sufficient collateral to serve as security for the funds PAF advanced.

338. Farrell's actions were reckless, indifferent to MicroBilt's and PAF's best interests, and were in deliberate disregard of the rights of PAF, MicroBilt and PAF's other equity holders who expected Farrell to act in good faith and with loyalty to PAF.

339. As a result of Farrell's actions, MicroBilt and PAF have suffered and continue to suffer damages.

340. Likewise, Szostak breached his fiduciary duties of care and loyalty by engaging in grossly negligent conduct and failing and simply refusing to fulfill his responsibilities.

84

Furthermore, as detailed above, Szostak engaged in intentional acts of misappropriating customer and prospect contacts for his own personal use, using PAF's resources to promote his wife's business and fund her travel, and intentionally sabotaging the efforts of the fund to raise funds.

341. Szostak's actions were reckless and indifferent to MicroBilt's and PAF's best interests, and were in deliberate disregard of the rights of PAF, MicroBilt and PAF's other equity holders who expected Szostak to act in good faith and with loyalty to PAF.

342. As a result of Szostak's actions, PAF, MicroBilt and PAF's other equity holders have suffered and continue to suffer damages.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation request that the Court enter judgment in their favor and against Robert Farrell and Bert Szostak, on Count II of the Fourth Amended Counterclaim, and award MicroBilt and PAF the following:

  a. their actual and compensatory damages as applicable, to be proven at trial;

  b. incidental, consequential and punitive damages as permitted by law;

  c. pre-judgment and post-judgment interest as applicable;

  d. equitable disgorgement of all compensation and equity interests in Successor PAF;

  e. their attorneys' fees and costs of suit; and

  f. such other relief as the Court deems equitable and just under the circumstances.

**COUNT III**

**AIDING AND ABETTING
BREACH OF FIDUCIARY DUTY**

**(MicroBilt and PAF v. Farrell, Szostak, Nanda, CBD, DVS, Barrile, Baldo, Bernstein, BMLLC, West, SEC Consultants, Copley, Sarah and JOHN DOE)**

343. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

344. As set forth in the preceding Count, Farrell and Szostak breached their fiduciary duties owed to MicroBilt and PAF loyalty by being grossly negligent in fulfilling their responsibilities and by intentionally engaging in a campaign to financially harm MicroBilt and PAF through the dissemination of MicroBilt's and PAF's Confidential Information and the concomitant dissemination of False Information about MicroBilt and PAF.

345. Each of the other Third Party Counterclaim-Defendants, namely Nanda, Barrile, Baldo, Bernstein and West, in the manner and means set forth *supra*, knowingly, willfully, intentionally and/or recklessly aided and abetted Farrell's and Szostak's breach of those fiduciary duties by conspiring with and being complicit in, and otherwise providing material assistance in support of, the prohibited and unlawful disclosure of the Confidential Information to unauthorized third parties and the dissemination of the False Information.

346. Each of the other Third Party Counterclaim-Defendants, namely Nanda, Barrile, Baldo, Bernstein and West, knew that Farrell and Szostak held fiduciary duties to MicroBilt and PAF, and that their material assistance aided and abetted the breach of those fiduciary duties.

347. The actions of these Third Party Counterclaim-Defendants, namely Nanda, Barrile, Baldo, Bernstein and West, were in material and substantial assistance with Farrell's and Szostak's breach of their fiduciary duty that caused injury to MicroBilt and PAF.

348. Sarah, in the manner and means set forth *supra*, including managing PAF's public-facing accounts [SC-000000018; SC-000000021], receiving blind-copied internal PAF and MicroBilt correspondence [SC-000000020], receiving forwarded litigation strategy [Szostak-000061157], and transmitting the sealed Complaint to financial-press reporters under her own name and through her own account [SC-000005708; SC-000005711; SC-000005789; SC-

000005867], knowingly provided substantial assistance to Szostak's breach of his fiduciary duties to MicroBilt and PAF, with knowledge that her conduct assisted the wrongful scheme.

349. Sarah's actions in this regard were intentional, malicious and in deliberate disregard of MicroBilt's and PAF's rights.

350. The conduct of Copley and Sarah alleged in this Count III was undertaken in their respective individual capacities, and not merely as agents, employees, family members, or representatives of Szostak or any other party.

351. Each of Copley and Sarah acted with her own independent knowledge of the False Scheme, her own specific subjective intent to cause economic injury to MicroBilt and PAF, and her own willful and malicious purpose in furtherance thereof.

352. Copley's and Sarah's respective knowing, willful, and malicious participation in aiding and abetting the breach of fiduciary duties owed to MicroBilt and PAF was the product of their own individual decisions and intentions, independently of Szostak's conduct.

353. These Third Party Counterclaim-Defendants, namely Nanda, Barrile, Baldo, Bernstein and West, were regularly and contemporaneously aware of their complicit role in substantially aiding and abetting Farrell's and Szostak's breaches of fiduciary duty and other wrongful acts as are set forth in the preceding allegations and otherwise described herein.

354. The actions of these Third Party Counterclaim-Defendants, namely Nanda, Barrile, Baldo, Bernstein and West, that aided and abetted Farrell's and Szostak's fiduciary duties, were malicious, intentional, knowing, reckless and indifferent to MicroBilt's and PAF's best interests, and were in deliberate disregard of the rights of PAF, MicroBilt and PAF's other equity holders who expected Farrell and Szostak to act in fiduciary good faith and with loyalty to MicroBilt and PAF.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation, respectfully request that the Court enter judgment in their favor and against Robert Farrell, Robert Szostak, Lawrence West, SEC Consultants, LLC, Edward M. Bernstein, Bernstein & Manahan, LLC, Darren M. Baldo, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc. Dynamic Vertical Solutions, Inc., Copley Szostak and Sarah Copley Szostak, jointly and severally, on Count III of the Fourth Amended Counterclaim, and further enter an order that:

a. grants MicroBilt and PAF their actual and compensatory damages as applicable, to be proven at trial;

b. grants MicroBilt and PAF incidental, consequential and punitive damages as permitted by law;

c. grants MicroBilt and PAF pre-judgment and post-judgment interest as applicable;

d. grants MicroBilt and PAF their attorneys' fees and costs; and

e. grants MicroBilt and PAF such other relief as the Court deems equitable and just under the circumstances.

## COUNT IV

### STATUTORY AND COMMON LAW
### <u>MISAPPROPRIATION OF TRADE SECRETS</u>

### (MicroBilt and PAF v. Farrell, Szostak, Nanda, CBD, DVS And Barrile)

355. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

356. Farrell, Szostak, Nanda and Barrile acquired access to and knowledge of MicroBilt's and Successor PAF's Confidential Information and trade secrets, including without limitation the list of contacts, customer leads, customers, internal business processes, procedures, internal financial information, confidential business plans and sensitive internal communications,

in their roles as Managing Members, and equity holders in PAF, or through their paid consulting and contracting roles as high-level insider executives of MicroBilt.

357. The Confidential Information that Farrell, Szostak, Nanda and Barrile retained, used and/or disclosed as part of the False Scheme consists of, at a minimum without limitation, the confidential identity of certain PAF clients and prospective clients, the confidential identity of certain PAF funding sources, the specific financing terms and business arrangements MicroBilt and PAF have with its clients and affiliates, MicroBilt's and PAF's confidential analytic reports, and MicroBilt's and PAF's processes, procedures, internal financial information, confidential business plans and sensitive internal communications.

358. MicroBilt and PAF expended substantial time, effort and money to develop their Confidential Information concerning clients, funding sources, business arrangements, analytic reports and processes, procedures, financial data, confidential business plans and sensitive internal communications.

359. MicroBilt's and Successor PAF's Confidential Information is not available to the general public.

360. MicroBilt and PAF derive independent economic value and a competitive edge in the marketplace from its Confidential Information by virtue of its secrecy and not being generally known.

361. MicroBilt and Successor PAF have taken take reasonable measures under the circumstances to protect the confidentiality of its Confidential Information, as described further above.

362. Farrell, Szostak, Nanda and Barrile acquired MicroBilt's and PAF's trade secrets and confidential information, set forth herein as Confidential Information, in their capacities as Managing Members and equity holders in PAF, and through their paid consulting and contracting

roles as high-level insider executives of and consultants for MicroBilt, and, in all cases, under circumstances, both contractually and statutorily, giving rise to a duty to maintain the secrecy or limit the use and disclosure of the Confidential Information.

363. Any use or disclosure of these trade secrets and Confidential Information, which were developed through and by MicroBilt's and PAF's investment of time, effort and expense, in its clients and business, outside of MicroBilt and PAF, would be devastating and in violation of the New Jersey Trade Secrets Act and at New Jersey common law.

364. Because Farrell and Szostak worked for and/or were involved in the management and operation of Keycap Funding, and/or Princeton Lenders and/or Crossbow Capital (or similar entities which relied and may still rely upon the misappropriated Confidential Information), all of which competed with PAF, and because Farrell, Szostak, Nanda and Barrile, along with other Third Party Counterclaim-Defendants, have conspired to cause financial harm to MicroBilt and PAF, these trade secrets and Confidential Information are or were now in the hands of MicroBilt's and PAF's competitors and other parties that are intent upon causing financial harm to MicroBilt and PAF.

365. Although Keycap Funding is apparently dissolved and is no further in operation, the Counterclaim Plaintiffs are without an understanding how the knowledge as to the damage caused by Keycap Funding's improper access to Confidential Information and such Confidential Information is currently being used and abused to the financial harm of Counterclaim Plaintiffs.

366. Upon information and belief, Farrell, Szostak, Nanda and Barrile have already used these trade secrets and Confidential Information to solicit PAF's customers, prospective customers, investors and prospective investors, as well as, in furtherance of the False Scheme, to disseminate such Confidential Information to parties intending to cause financial harm of MicroBilt and PAF.

367. Farrell's, Szostak's, Nanda's and Barrile's use of MicroBilt's and PAF's trade secrets and Confidential Information was and is without PAF's or MicroBilt's express or implied consent.

368. By virtue of Farrell's, Szostak's, Nanda's and Barrile's actions and actual and threatened misappropriation of MicroBilt's and PAF's trade secrets and Confidential Information, MicroBilt and PAF has suffered, will suffer and is threatened to suffer, immediate and irreparable harm.

369. Farrell's, Szostak's, Nanda's and Barrile's actual and threatened misappropriation of trade secrets and Confidential Information must be enjoined.

370. Unless Farrell, Szostak, Nanda and Barrile are enjoined from soliciting PAF's customers, and enjoined from using or disclosing MicroBilt's and PAF's trade secrets and Confidential Information to cause financial harm to MicroBilt and PAF, MicroBilt and PAF will be irreparably harmed by:

     a. an unquantifiable loss of sales and profits;

     b. loss and diminution of customer relationships and professional reputation;

     c. the immediate and direct accessibility of MicroBilt's and PAF's institutional knowledge, financing terms, business strategies, business plans, financial data and other practices to its customers by Keycap Funding and other parties intending to cause financial harm to MicroBilt and PAF;

     d. loss and diminution of customer confidence, trust and goodwill; and

     e. loss of confidential, proprietary and trade secret information.

371. MicroBilt and PAF have no adequate remedy at law.

372. Farrell's, Szostak's, Nanda's and Barrile's conduct has been willful and outrageous, and was undertaken with reckless indifference to MicroBilt's and PAF's rights.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation, respectfully requests that the Court enter judgment in its favor and against Robert Farrell, Robert Szostak, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., and Dynamic Vertical Solutions, Inc., on Count IV of the Fourth Amended Counterclaim, and further enter an order that:

a. permanently restrains Robert Farrell, Robert Szostak, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., and Dynamic Vertical Solutions, Inc., and each person acting in concert with them or on their behalf, from soliciting, selling to, or servicing PAF's customers, on behalf of Keycap Funding, and from otherwise utilizing the Confidential Information in order to enrich themselves;

b. grants MicroBilt and PAF their actual and compensatory damages as applicable, to be proven at trial;

c. grants MicroBilt and PAF incidental, consequential and punitive damages as permitted by law;

d. grants MicroBilt and PAF pre-judgment and post-judgment interest as applicable;

e. grants MicroBilt and PAF their attorneys' fees and costs, including all damages permitted by and pursuant to the New Jersey Uniform Trade Secrets Act (N.J.S.A. 56:15-1 *et. seq*.) (or at common law) and/or authorized by the respective agreements that MicroBilt and PAF had with Robert Farrell, Robert Szostak, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., And Dynamic Vertical Solutions, Inc.; and

f. grants MicroBilt and PAF such other relief as the Court deems equitable and just under the circumstances.

## COUNT V

## BREACH OF NON-DISCLOSURE AGREEMENTS

## (MicroBilt v. Farrell, Szostak, Nanda, CBD And DVS)

373. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

374. The Non-Disclosure Agreements, attached as **Exhibit A**, **Exhibit B**, and **Exhibit C** (the Nanda Agreements) are valid and enforceable agreements that Farrell, Szostak and Nanda signed and agreed to be bound by.

375. Specifically, Farrell, Szostak and Nanda agreed to specific confidentiality provisions in these Non-Disclosure Agreements that prohibited Farrell, Szostak and Nanda from disclosing the Confidential Information that they learned of regarding MicroBilt's Confidential Information.

376. Farrell, Szostak and Nanda breached the Non-Disclosure Agreements by diverting Confidential Information belonging to MicroBilt and MicroBilt's subsidiaries and affiliates, including PAF, PAIF and Fund Recovery, for use outside of MicroBilt as contemplated in the Non-Disclosure Agreements.

377. In particular, and without limitation, Farrell and Szostak further breached the Non-Disclosure Agreements by failing and refusing to return or destroy the Confidential Information as requested in their January 4, 2016 termination letter.

378. This Confidential Information included all Confidential Information of MicroBilt, including without limitation, the list of contacts, customer leads, customers, internal business processes, procedures, internal financial information, confidential business plans and sensitive business communications of MicroBilt.

379. MicroBilt's Confidential Information is not available to the general public and MicroBilt takes reasonable measures to protect the confidentiality of its Confidential Information.

380. Farrell, Szostak and Nanda acquired MicroBilt's Confidential Information in their capacities as PAF Representatives and/or as paid high-level executive consultants who were contractually obligated to maintain the secrecy of this Confidential Information.

381. Because Farrell and Szostak now work for, or are involved in Keycap Funding, and/or Princeton Lenders and/or Crossbow Capital, and other business ventures, and because Nanda has utilized the Confidential Information by disseminating and disclosing such Confidential Information to unauthorized third parties for his own financial gain, and in furtherance of the False scheme to cause financial harm to MicroBilt and PAF, MicroBilt's rights under the Non-Disclosure Agreements have been and are continuing to be violated and denied.

382. Upon information and belief, Farrell, Szostak and Nanda have been using the Confidential Information to solicit customers, prospective customers, investors and prospective investors, and to otherwise impugn, as part of the False Scheme, the integrity and professional reputation of MicroBilt in an effort to cause financial harm to MicroBilt and for their own personal financial gain.

383. Farrell's, Szostak's and Nanda's use of the Confidential Information is without the consent of MicroBilt.

384. By virtue of Farrell's, Szostak's and Nanda's breach of their respective Non-Disclosure Agreements, MicroBilt has suffered, will suffer and is threatened to suffer, immediate and irreparable harm.

385. Farrell's, Szostak's and Nanda's active, malicious and reckless misuse of MicroBilt's Confidential Information should be enjoined.

386. Farrell's, Szostak's and Nanda's conduct has been willful and outrageous, and was undertaken with reckless indifference to MicroBilt's rights.

**WHEREFORE**, MicroBilt Corporation respectfully requests that the Court enter judgment in its favor and against Robert Farrell, Robert Szostak, Patanjali Nanda, Creative Business Decisions, Inc., and Dynamic Vertical Solutions, Inc., on Count V of the Fourth Amended Counterclaim, and enter an Order that:

a. permanently restrains Robert Farrell, Robert Szostak and each person acting in concert with them or on their behalf from soliciting, selling to, or servicing customers, customer leads or prospects originating with PAF or MicroBilt;

b. grants MicroBilt its actual and compensatory damages as applicable, to be proven at trial;

c. grants MicroBilt incidental, consequential and punitive damages as permitted by law;

d. grants MicroBilt pre-judgment and post-judgment interest as applicable;

e. grants MicroBilt its attorneys' fees and costs; and

f. grants MicroBilt such other relief as the Court deems equitable and just under the circumstances.

**COUNT VI**

**AIDING AND ABETTING BREACH OF
DUTIES OF NON-DISCLOSURE OF TRADE SECRETS**

**(MicroBilt and PAF v. Farrell, Szostak, Nanda, CBD, DVS, Barrile,
Baldo, Bernstein, BMLLC, West, SEC Consultants, Copley, Sarah and JOHN DOE)**

387. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

388. As set forth in the preceding Counts IV and V, Farrell, Szostak, Nanda and Barrile breached their respective contractual, statutory and common law duties of non-disclosure of the Confidential Information of MicroBilt and PAF by accessing and distributing such Confidential Information to unauthorized third parties, all in an effort to cause the financial harm to MicroBilt and PAF and to enrich themselves either by receiving a portion of the Whistleblower Award and/or by participating in the growth and financial success of Keycap Funding and other business ventures of Farrell, Szostak, Nanda and Barrile.

389. Each of Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein and West, in the manner and means set forth *supra*, knowingly, willfully, intentionally and/or recklessly aided and abetted

95

in Farrell's, Szostak's, Nanda's and Barrile's breach of their respective contractual, statutory and common law duties of non-disclosure of PAF's and/or MicroBilt's Confidential Information, by conspiring with and being complicit in, and providing material assistance to, the prohibited and unlawful disclosure of such Confidential Information to unauthorized third parties.

390. The actions of Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein and West were in material and substantial assistance with Farrell's, Szostak's, Nanda's and Barrile's breach of their respective contractual and common law duties of non-disclosure of MicroBilt's and PAF's Confidential Information that caused injury to MicroBilt and PAF.

391. Sarah knowingly provided substantial assistance to the breach of the duties of non-disclosure by transmitting the sealed First Amended Verified Complaint, a pleading containing the Confidential Information whose confidential character was then the subject of a pending sealing application before this Court, to members of the financial press, in the manner set forth supra. [SC-000005631; SC-000005708; SC-000005711; SC-000005789; SC-000005867].

392. Sarah's conduct in providing such assistance was intentional, malicious and in deliberate disregard of MicroBilt's and PAF's rights.

393. The conduct of Copley and Sarah alleged in this Count VI was undertaken in their respective individual capacities, and not merely as agents, employees, family members, or representatives of Szostak or any other party.

394. Each of Copley and Sarah acted with her own independent knowledge of the False Scheme, her own specific subjective intent to cause economic injury to MicroBilt and PAF, and her own willful and malicious purpose in furtherance thereof.

395. Copley's and Sarah's respective knowing, willful, and malicious participation in aiding and abetting the breach of non-disclosure duties owed to MicroBilt and PAF was the product of their own individual decisions and intentions, independently of Szostak's conduct.

96

396. Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein and West were regularly and contemporaneously aware of their complicit role in substantially aiding and abetting Farrell's, Szostak's, Nanda's and Barrile's breach of their respective contractual, statutory and common law duties of non-disclosure of MicroBilt's and PAF's Confidential Information and other wrongful acts as are set forth in the preceding allegations and otherwise described herein.

397. The actions of Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein and West that aided and abetted Farrell's, Szostak's, Nanda's and Barrile's breach of their respective contractual, statutory and common law duties of non-disclosure of MicroBilt's and PAF's Confidential Information, were intentional, malicious, reckless and indifferent to MicroBilt's and PAF's best interests, and were in deliberate disregard of the rights of MicroBilt and PAF who expected Farrell, Szostak, Nanda and Barrile to act in a lawful and contractual manner to protect the non-disclosure of MicroBilt's and PAF's Confidential Information.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation, respectfully request that the Court enter judgment in their favor and against Robert Farrell, Robert Szostak, Lawrence West, SEC Consultants, LLC, Edward M. Bernstein, Bernstein & Manahan, LLC, Darren M. Baldo, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., Dynamic Vertical Solutions, Inc., Copley Szostak and Sarah Copley Szostak, jointly and severally, on Count VI of the Fourth Amended Counterclaim, and further enter an order that:

    a. grants MicroBilt and PAF their actual and compensatory damages as applicable, to be proven at trial;

    b. grants MicroBilt and PAF incidental, consequential and punitive damages as permitted by law;

    c. grants MicroBilt and PAF pre-judgment and post-judgment interest as applicable;

    d. grants MicroBilt and PAF their attorneys' fees and costs; and

e.  grants MicroBilt and PAF such other relief as the Court deems equitable and just under the circumstances.

## COUNT VII

## **FRAUD**

## **(PAF v. Farrell And Szostak)**

398.    The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

399.    Farrell and Szostak also conspired with Ranger, one of PAF's investors, to create spreadsheets that were knowingly false and represented to PAF members and officers, that PAF had not extended credit facilities to any single loan originator in excess of $4 million.

400.    The spreadsheets that Farrell and Szostak created and circulated with Ranger's assistance, represented that all loans originated by Argon Credit were held in numerous individual subsidiaries (or single purpose entities) in various states throughout the United States.

401.    Wojciechowski discovered in early 2017 that the information on the spreadsheets was false as the loans were all held by Argon X, LLC, and not the individual subsidiaries established by Argon Credit to originate the loans.

402.    Farrell and Szostak, with Ranger's assistance, created the spreadsheets on a monthly basis showing the loans being held by the Argon Credit subsidiaries and not Argon X.

403.    To make matters worse, Farrell and Szostak provided these spreadsheets to Ranger and to PAF and PAF's officers to demonstrate the entities that owned the loans and to show that the investor was compliant with its own fund documents.

404.    Farrell and Szostak also used the fraudulent spreadsheets to induce PAF to fund loans originated by the Argon Credit subsidiaries, in amounts that were far in excess of the amounts Argon Credit should have reasonably been able to borrow.

405.    Farrell and Szostak never advised the other members of PAF or PAF's officers of their actions and the creation of knowingly false spreadsheets that were relied on to fund loans.

406.    Argon Credit ultimately filed for bankruptcy in December 2016.

407.    Upon information and belief, following the bankruptcy filing, as set forth supra in detail and with particularity, Farrell and Szostak contacted the SEC and made knowingly false statements to the SEC's investigators and counsel about PAF and PAF's operations.

408.    Farrell and Szostak created and distributed these false spreadsheets in order to cause financial harm and professional disrepute on PAF, MicroBilt, Burgess and Wojciechowski.

409.    As a result of Farrell's and Szostak's actions in creating and distributing knowingly false spreadsheets, circulating them to PAF and PAF's officers and making false statements to the SEC, PAF has been damaged by approximately $30,000,000.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, respectfully requests that the Court enter judgment in its favor and against Robert Farrell and Robert Szostak, on Count VII of the Fourth Amended Counterclaim, as follows:

a.    grants PAF its actual and compensatory damages as applicable, to be proven at trial;

b.    grants PAF incidental, consequential and punitive damages as permitted by law;

c.    grants PAF pre-judgment and post-judgment interest as applicable;

d.    grants PAF its attorneys' fees and costs; and

e.    grants PAF such other relief as the Court deems equitable and just under the circumstances.

## COUNT VIII

## COMMERCIAL DISPARAGEMENT/TRADE LIBEL

**(MicroBilt and PAF v. Farrell, Szostak, Nanda, CBD, DVS, Barrile,**

**Baldo, Bernstein, BMLLC, West, SEC Consultants, Copley, Sarah and JOHN DOE)**

410.     The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

411.     Through the various intentional and malicious actions set forth supra, both individually and through their respective corporate entities, defendants Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein, West, Copley, and Sarah disparaged the professional reputation of MicroBilt and PAF. As used in this Count VIII, Copley and Sarah each maliciously and deliberately disseminated, and aided and abetted the dissemination of, the False Information and the sealed litigation materials to the financial press, including the Hedge Fund Reporter, Pageant Media, AltFi, debanked.com, and The Wall Street Journal, in knowing violation of New Jersey common law and in deliberate furtherance of the False Scheme, in an effort to cause financial harm to MicroBilt and PAF.

412.     The conduct of Copley and Sarah alleged in this Count VIII was undertaken in their respective individual capacities, and not merely as agents, employees, family members, or representatives of Szostak or any other party. Each of Copley and Sarah acted with her own independent knowledge of the False Scheme, her own specific subjective intent to cause economic injury to MicroBilt and PAF, and her own willful and malicious purpose in furtherance thereof. The commercial disparagement of MicroBilt's and PAF's professional reputations caused by Copley's and Sarah's respective individual conduct was the product of their own independent decisions and intentions, each acting with full awareness of the falsity of the materials being disseminated and the economic injury that dissemination was designed to cause.

413.     Specifically, these defendants named in this Count VIII maliciously and deliberately disseminated, and aid and abetted in the dissemination of, the False Information to various third parties, including without limitation, the False Information Recipients that included

without limitation, the SEC, Ranger, PAIF Bankruptcy Trustee, Argon Credit Trustee, Goldstein, Virginia Counsel, and the Hedge Fund Reporter, in violation of both their statutory, corporate and common law duties, all in an effort to promote and cause financial harm to MicroBilt and PAF, and to enrich themselves by competitive business ventures and/or partaking in a potential Whistleblower Award.

414.    Each defendant named in this Count VIII aided and abetted other defendants in their respective individual and collective efforts to disseminate and publicize the False Information meant to disparage, harm and discredit MicroBilt and/or PAF.

415.    The dissemination of the False Information by the defendants named in this Count VIII were calculated by each defendant so as to induce, encourage and otherwise prevent others from not dealing with MicroBilt and/o PAF, and to otherwise disadvantageously interfere with MicroBilt's and PAF's relations with others parties with whom both MicroBilt and/or PAF did business.

416.    Each defendant named in this Count VIII acted with malice to disparage the professional reputation of MicroBilt and PAF in order to enrich themselves either by earning a portion of the Whistleblower Award, through the collection of attorneys' or other professional fees, and/or through the corporate success of Keycap Funding and/or other professional ventures of Farrell and Szostak.

417.    As a result of the purposeful and malicious publication of the False Information by Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein, West, Copley and Sarah, MicroBilt and PAF suffered damages to their professional reputation, including not only the specific loss of specific clients and lucrative business opportunities (all of which information will be produced under seal).

418.    MicroBilt and PAF have also suffered significant damages caused by the need of MicroBilt and PAF to not only defend themselves in multiple litigations but also the costs related

to the repair of their professional reputation, during which time MicroBilt and PAF have lost specific clients and other business opportunities (all of which information will be produced under seal).

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation, respectfully request that the Court enter judgment in their favor and against Robert Farrell, Robert Szostak, Lawrence West, SEC Consultants, LLC, Edward M. Bernstein, Bernstein & Manahan, LLC, Darren M. Baldo, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., Dynamic Vertical Solutions, Inc., Copley Szostak and Sarah Copley Szostak, jointly and severally, on Count VIII of the Fourth Amended Counterclaim, and further enter an order that:

a. grants MicroBilt and PAF their actual and compensatory damages as applicable, to be proven at trial;

b. grants MicroBilt and PAF incidental, consequential and punitive damages as permitted by law;

c. grants MicroBilt and PAF pre-judgment and post-judgment interest as applicable;

d. grants MicroBilt and PAF their attorneys' fees and costs; and

e. grants MicroBilt and PAF such other relief as the Court deems equitable and just under the circumstances.

## COUNT IX

### CIVIL CONSPIRACY

**(MicroBilt and PAF v. Farrell, Szostak, Nanda, CBD, DVS, Barrile, Baldo, Bernstein, BMLLC, West, SEC Consultants, Copley, Sarah and JOHN DOE)**

419. The foregoing and all subsequent paragraphs hereafter are incorporated herein by reference as if set forth in full.

420. Through the various intentional and malicious actions in furtherance of the False Scheme set forth *supra*, both individually and through their respective corporate entities,

defendants Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein and West, each conspired with Farrell, Szostak and each other, to disparage the professional reputation of MicroBilt and PAF and cause financial harm to MicroBilt and PAF not only through, as set forth in the preceding allegations and Counts, the breaches of fiduciary duty, misappropriation of trade secrets and the unauthorized disclosure of Confidential Information, but also through the dissemination of False Information to third parties, including without limitation, the False Information Recipients, all with a purpose of causing financial harm to MicroBilt and PAF while simultaneously enriching themselves either through earning a portion of the Whistleblower Award and/or through participation in the success of Keycap Funding and other competitive business ventures of Farrell and Szostak.

421. Specifically, these defendants named in this Court IX maliciously and deliberately conspired with each other to disseminate, and to aid and abet in the dissemination of, the False Information to various third parties, including without limitation, the False Information Recipients, in violation of both their statutory, contractual, corporate and common law duties, all in an effort to promote and cause financial harm to MicroBilt and PAF, and to enrich themselves.

422. Each defendant named in this Count IX conspired with, and aided and abetted, each defendant in their respective individual and collective efforts to disseminate and publicize the False Information meant to disparage MicroBilt and/or PAF.

423. Copley and Sarah each knowingly agreed with Szostak, and acted independently and in furtherance of the common scheme, to disseminate the False Information and sealed litigation materials to the False Information Recipients for the purpose of causing financial harm to MicroBilt and PAF, as evidenced by their receipt of litigation strategy [Szostak-000061157], Copley's transmission of litigation materials to the Hedge Fund Reporter [CS-000000917], and Sarah's transmissions to Pageant Media, AltFi, debanked.com, and The Wall Street Journal [SC-

000005708; SC-000005711; SC-000005789; SC-000005867]. Sarah's participation in the Conspiracy further included: her ongoing active assistance to Szostak with litigation documents, answers, and exhibits in this proceeding through 2021 [Szostak-000192765; Szostak-000192776; Szostak-000192793; Szostak-000192822]; her real-time tracking and financial anticipation of the SEC complaint against MicroBilt and PAF [Szostak-000192777]; her coordination of her subpoena response in this litigation with Baldo, a co-defendant [SC-000005313]; and her management of billing accounts for Farrell and Nanda — co-participants in the Conspiracy — through Lead Hero LLC [Szostak-000188615; Szostak-000229133]. Each of these acts was committed during the pendency of this litigation and confirms that Sarah's agreement to participate in the Conspiracy was ongoing and continuous, not limited to the 2016 press transmissions.

424.    Copley's and Sarah's participation in the Conspiracy was undertaken in their individual capacities, not merely as agents of Szostak.

425.    The dissemination of the False Information by the defendants named in this Count IX were calculated by each defendant so as to induce, encourage and otherwise prevent others from not dealing with MicroBilt and/or PAF, to instigate and increase legal processes against MicroBilt and/or PAF, and to otherwise disadvantageously interfere with MicroBilt's and PAF's relations with others parties with whom both MicroBilt and/or PAF did business.

426.    Each defendant named in this Count IX conspired together with Farrell and Szostak and acted with malice to disparage the professional reputation of and cause financial harm to MicroBilt and PAF in order to enrich themselves either by earning a portion of the Whistleblower Award, through the collection of attorneys' or other professional fees, and/or through the corporate success of Keycap Funding and/or other professional competitive ventures of Farrell and Szostak.

427.    As a result of the purposeful and malicious conspiracy to publicize the False Information by Farrell, Szostak, Nanda, Barrile, Baldo, Bernstein, West, Copley and Sarah,

MicroBilt and PAF suffered damages to their respective professional reputations, including not only the loss of clients and lucrative business opportunities, but MicroBilt and PAF have suffered significant damages caused by the need of MicroBilt and PAF to not only defend themselves in multiple litigations but also the costs related to the repair of their professional reputation.

**WHEREFORE**, Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC, and MicroBilt Corporation, respectfully request that the Court enter judgment in their favor and against Robert Farrell, Robert Szostak, Lawrence West, SEC Consultants, LLC, Edward M. Bernstein, Bernstein & Manahan, LLC, Darren M. Baldo, John Barrile, Patanjali Nanda, Creative Business Decisions, Inc., Dynamic Vertical Solutions, Inc., Copley Szostak and Sarah Copley Szostak, jointly and severally, on Count IX of the Fourth Amended Counterclaim, and further enter an order that:

a. grants MicroBilt and PAF their actual and compensatory damages as applicable, to be proven at trial;

b. grants MicroBilt and PAF incidental, consequential and punitive damages as permitted by law;

c. grants MicroBilt and PAF pre-judgment and post-judgment interest as applicable;

d. grants MicroBilt and PAF their attorneys' fees and costs; and

e. grants MicroBilt and PAF such other relief as the Court deems equitable and just under the circumstances.

**[Remainder Of Page Left Intentionally Blank]**

**[Signature Page Follows]**

# <u>TO BE FILED UNDERSEAL</u>

## <u>Exhibit A</u> – Non-Disclosure Agreement

## <u>Exhibit B</u> – Non-Disclosure Agreement

## <u>Exhibit C</u> – Nanda Agreements

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:5-1(c), Angelo A. Stio III is designated as trial counsel in this matter for MicroBilt Corporation ("MicroBilt") as against Plaintiffs/Counterclaim-Defendants Farrell and Szostak (*i.e.*, Counts I – IX). Bruce S. Luckman is designated as trial counsel in the matter for Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC ("PAF"), as against Plaintiffs/Counterclaim-Defendants Farrell and Szostak (*i.e.*, Counts I – IX). Gerald Krovatin, Esquire, and Gerard M. McCabe, Esquire, are designated as trial counsel in the matter for those state law claims (*i.e.*, Counts I, III, IV, V, VI, VIII and IX) being asserted by MicroBilt and PAF against each of the Third Party Counterclaim-Defendants.

## CERTIFICATION PURSUANT TO RULE 4:5-1(B)(2)

I hereby certify that to the best of my knowledge, this matter is not the subject of any other action pending in any Court or of any pending arbitration proceeding, and that no other action or arbitration is contemplated at this time.

| | |
|---|---|
| *s/Bruce S. Luckman* | *s/Angelo A. Stio, III* |
| Bruce S. Luckman, Esquire | Angelo A. Stio III (#014791997) |
| **SHERMAN, SILVERSTEIN,** | Stephanie L. Jonaitis (#015142002) |
| **KOHL, ROSE & PODOLSKY, P.A.** | **TROUTMAN PEPPER** |
| 308 Harper Dr., #200 | **HAMILTON SANDERS LLP** |
| Moorestown, New Jersey 08057 | 301 Carnegie Center, Suite 400 |
| (856) 663-1503 | Princeton, NJ 08543-5276 |
| | (609) 452-0808 |
| *Attorneys for Defendant Princeton Alternative Funding, LLC f/k/a MicroBilt Capital Funding, LLC, as successor-in-interest to Princeton Alternative Funding, LLC* | *Attorneys for MicroBilt Corporation* |
| | *s/ Gerard M. McCabe* |
| *s/ Gerald Krovatin* | Gerard M. McCabe, Esquire |
| Gerald Krovatin, Esquire | (to be admitted *Pro Hac Vice*) |
| **KROVATIN NAU, LLC** | **McCABE LAW GROUP, LLC** |
| 60 Park Place, Suite 1100 | 42 Hawkswell Circle |
| Newark, NJ 07102 | Oreland, PA 19075 |
| | (215) 965-0003 (Main) |

*Attorneys for Counterclaim Plaintiffs*
*MicroBilt Corporation And Princeton*
*Alternative Funding, LLC f/k/a*
*MicroBilt Capital Funding, LLC, as*
*successor-in-interest to Princeton*
*Alternative Funding, LLC*

*Attorneys for Counterclaim Plaintiffs*
*MicroBilt Corporation And Princeton*
*Alternative Funding, LLC f/k/a MicroBilt*
*Capital Funding, LLC, as successor-in-interest*
*to Princeton Alternative Funding, LLC*

Dated: February ____, 2023